**DISTRICT COURT OF THE**
**DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **BARON JAMAL BELL** ) | |
| **12212 Asbury Drive** ) | |
| **Fort Washington, MD 20744** ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| **v.** ) | **Civil Action No. 23-cv-02036 (RC)** |
| ) | |
| **DISTRICT OF COLUMBIA GOVERNMENT** ) | **Jury Trial Demand** |
| **1350 Pennsylvania Avenue, N.W.** ) | |
| **Washington, D.C. 20004** ) | |
| ) | |
| *Serving:* ) | |
| ) | |
| **Honorable Muriel Bower** ) | |
| **Mayor of the District of Columbia** ) | |
| **1350 Pennsylvania Avenue, N.W.** ) | |
| **Washington, D.C. 20004** ) | |
| ) | |
| **Attorney General for the District of Columbia** ) | |
| **441 Fourth Street, N.W., Suite 630S** ) | |
| **Washington, D.C. 20001** ) | |
| ) | |
| *Defendant.* ) | |
| ) | |

## AMENDED COMPLAINT FOR DAMAGES

Comes now Plaintiff Baron Bell, Pro se, hereby files this Amended Complaint against Defendant, District of Columbia Government, pursuant to 42 U.S.C. § 1983 for violating protections under the First (Speech and Religion), Fourth (Expectations of Privacy & Unreasonable Seizure), and Fifth (Substantive Due Process, Procedural Due Process, & Liberty Interest) Amendments of the United States Constitution. Plaintiff also brings counts for violating the District of Columbia Whistleblower Law, D.C. Code Ann. § 1-615.51 *et seq*; the District of Columbia Human Rights Act, D.C. Code Ann. § 2-1401 *et seq;* and for violating employee protections afforded under the District

1

RECEIVED

JUL 5 2024

Clerk, U.S. District & Bankruptcy
Court for the District of Columbia

of Columbia Comprehensive Merit Personnel Act (CMPA), D.C. Code § 1-603.01, *et seq.* Plaintiff also sues for Constructive Discharge; Hostile Work Environment; Intentional Infliction of Emotional Distress; Defamation; Invasion of Privacy False Light; Negligence; and Wrongful Termination. The Plaintiff's statutory, common law, and tort claims are under this Court's pendant jurisdiction.

## STATEMENT OF THE CLAIM

The Plaintiff brings this lawsuit asserting that his former employer, the Defendant, was grossly negligent in not affording him a safe, humane, and dignified work environment, entitlements defined in the CMPA. The Defendant's gross negligence was failing to investigate the Plaintiff reporting an act of gender bullying in the workplace and failing to protect the Plaintiff from rumors and threats of violence. Thus, the Defendant's negligence was a violation of the Fifth Amendment's substantive due process clause. The Defendant's gross negligence also allowed and caused irreparable harm to the Plaintiff's reputation, further depriving him of a Constitutional liberty interest.

The Plaintiff avers the Defendant's gross negligence to ensure his work environment was safe, secure, and humane, with reasonable conditions of employment, where the Plaintiff could perform his job tasks unhindered and with dignity as the CMPA entitles, caused for him a hostile work environment. The Plaintiff further avers the hostile work environment resulting from the Defendant's gross negligence caused the Plaintiff's constructive discharge.

The Plaintiff further avers the Defendant violated the Fifth Amendment's due process clause by placing the Plaintiff on absent without leave status (AWOL) without an opportunity to respond, instead of answering his pleas for a safe work environment where he could perform his job tasks unhindered, with dignity, and without suffering harm to his reputation.

While AWOL for 11 months, the Plaintiff sent a personal e-mail to the private e-mail addresses of Sherita Grant and Monique Green, two DC government employees he had been friends

with for 17 years. Within this e-mail, the Plaintiff disclosed his intent to soon sue DC government for depriving him of substantive and procedural due process and for other violations of law. Of particular concern to the Plaintiff was not having to witness Women suffering bullying and being humiliated when in the employ of the people's government.

Resulting from this private and personal communication he shared with Ms. Grant and Ms. Green, the Plaintiff was later served with a summons to appear in the Circuit Court of Prince George's County Maryland on a Peace Order petition filed by Ms. Grant. During court proceedings, the Plaintiff learned from Ms. Grant's testimony, that she shared the Plaintiff's personal and private e-mail with the Defendant, specifically with DC Department of Health Director, La Quandra Nesbitt. Director Nesbitt in turn forwarded the Plaintiff's e-mail to DC Health's General Counsel, Phillip Husband, who in turn forwarded the Plaintiff's personal and private e-mail to the First District of the DC Metropolitan Police Department for investigation. Ms. Grant testified that she was interviewed by a Detective of the First District and afterwards informed no criminal action could be taken against the Plaintiff because there were no threats of any kind found in his communication.

A month later, July 15, 2022, the Plaintiff was wrongly terminated from employment by a summary removal action for threatening the personal safety of Ms. Grant by e-mail. The Plaintiff avers this action by the Defendant was libelous defamation and invasion of privacy false light, because Director Nesbitt knew from the investigation launched under her directive, the Plaintiff threatened no one in his private e-mail. And the Plaintiff argues the Defendant subjected him to adverse employment action behind a knowingly false proffer, to accommodate employee Grant and because the Plaintiff's private e-mail referenced his intention to sue the Defendant for matters of public concern. Thus, the Plaintiff asserts the Defendant's wrongful termination of his employment violated the First Amendment and the District of Columbia Whistleblower Act.

Moreover, the Plaintiff avers the Defendant violated the Fourth Amendment. The Fourth Amendment afforded the Plaintiff the reasonable expectation that government would not give knowingly false publicity to his private communication. The Fourth Amendment also afforded the Plaintiff protection against the government's unreasonable seizure of his property interest in his employment. The Defendant's manufacture of actionable conduct from the Plaintiff's private and lawful off-duty conduct, to seize his property interest in employment, was totally unreasonable.

The Plaintiff further asserts the manner of his termination from DC Health was in willful violation of the Fifth Amendment's due process clause. The Defendant intentionally suppressed the Plaintiff's Answer to a Proposed Separation, instead of officially deciding not to separate the Plaintiff from employment according to the timelines defined in DC Municipal Regulations. The Defendant deprived the Plaintiff of due process by not factoring in mitigating circumstances in executing a Final Summary Removal of the Plaintiff as required by the CMPA and DC Municipal regulations. The Defendant further deprived the Plaintiff of due process by executing a Final Summary Removal of the Plaintiff knowing he had not received prior notice of the removal action. However, the Defendant ignored two communications sent by the Plaintiff which could have served as his response to the Defendant's adverse action. And in one of the communications, the Plaintiff directed the Defendant to send all communication to his legal counsel, providing counsel's name, address, and contact. And upon learning of the Defendant's adverse action, the Plaintiff made a specific request he be afforded his *"due process"* employee right of response. The Defendant was silent on the Plaintiff's specific request for due process and thus intentionally violated the 5th Amendment's due process clause.

The Plaintiff further asserts the Defendant's violations of Constitutional protections were discriminatory, violating the District of Columbia Human Rights Act, and he finally asserts Director Nesbitt's libelous statements that he threatened the personal safety of a DC government employee were published intentionally to inflict emotional distress.

## I. JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Plaintiff's claims arise under the First Amendment, the Fourth Amendment, and Fifth Amendment to the United States Constitution. These claims are asserted here pursuant to 42 U.S.C. § 1983. Plaintiff's claims under the statutory law of the District of Columbia Human Rights Act, D.C. Code Ann. § 2-1401 *et seq*., arise from the same events as the constitutional claims and are within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367 and within this Court's statutory jurisdiction pursuant to D.C. Code § 2-1403.03. The Plaintiff's Whistleblower Act claims, employment law claims, and tort claims also arise out of the same actions as the Plaintiff's federal claims and statutory claims and are thus within the supplemental jurisdiction of the Court.

2.      The Plaintiff further asserts jurisdiction is proper in this Court as none of the adverse actions taken against him had any legitimate nexus to performance deficits cognizant in the District of Columbia's CMPA. At all times Plaintiff acted in good faith, pleading the Defendant to act upon D.C. Code § 1-603.01 *et seq.,* and policy issuances. *Koch v. White,* U.S. Court of Appeals, District of Columbia, 2013. In contrast, the Defendant's deliberate violations of D.C. Code § 1-603.01, *et seq.,* and moreover, Defendant's deliberate violations of federal protections are the actions which have brought this lawsuit before this Court.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), because the events giving rise to all claims occurred in the District of Columbia.

4.      The events giving rise to all claims commenced on January 7, 2021, culminating on July 31, 2022. Therefore, the filing of this lawsuit is within statutory timeframes established for the violations as enumerated in the above summary of factual allegations.

## II DC PRE-SUIT NOTICE: DC CODE § 12–309

5.    DC Code § 12–309 provides:

    *a) Except as provided in subsection (b) of this section, an action may not be maintained against the District of Columbia for unliquidated damages to person or property unless, within six months after the injury or damage was sustained, the claimant, his agent, or attorney has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage.*

6.    The purpose of the § 12-309 Notice is to allow the District to investigate potential claims while evidence is still available, to correct defective conditions jeopardizing the public's safety, and to settle meritorious claims while resisting frivolous claims. *Farris v. D.C.*, 257 A.3d 509, 514-15 (D.C. 2021).

7.    Section 12-309 Notice is satisfied by sending notice to the Office of the Mayor. *Turpin v. Dist. of Columbia*, Civil Action 22-1807 (TJK) (D.D.C. Oct. 26, 2022).

8.    The Plaintiff, on December 2, 2022, by e-mail, sent to the Office of the Mayor and to the Office of Risk Management, his notice to sue according to Section 12-309. Again, by certified mail on January 12, 2023, Section 12-309 notice was sent to the Office of the Mayor. [Exhibit 1].

9.    On December 5, 2022, Jim Slattery of the Executive Office of the Mayor flagged Betsy Cavendish of the Office of the Mayor, copying Vanessa Careiro of the Office of the Mayor, acknowledging receipt of the Plaintiff's Section 12-309 Notice. On December 19, 2022, Ms. Careiro of the Executive Office of the Mayor notified Phillip Husband, General Counsel of DC Health, that the Plaintiff's Section 12-309 Notice had been received. Promptly thereafter, Mr. Husband notified Charlene Wills, DC Health Counsel and John Parham, DC Health Human Resource Officer, that the Plaintiff's Section 12-309 Notice had been received and directed both to preserve all documents. [Exhibit 2]. Thus, the Plaintiff has satisfied the District of Columbia's Section 12-309 requirements.

### III PARTIES

10.     Plaintiff Bell is a Black, fifty-five (55) year old male, a legal citizen of the United States, and a resident of the state of Maryland. Prior to his unlawful termination, he was a dedicated employee and public servant with the Defendant District of Columbia Government for four (4) years, having served as a consultant for the DC Department of Health for 14 years.

11.     The DC Department of Health (DC Health) and the DC Department of Human Resources (DCHR) are executive agencies of the District of Columbia. The Plaintiff worked for DC Health's HIV/AIDS, STD, Tuberculosis, and Hepatitis Administration (HAHSTA).

### IV FACTUAL ALLEGATIONS

12.     On January 7, 2021, the Plaintiff witnessed a threat to the dignity and reasonableness of the conditions of his work environment, a threat to entitlements afforded by the CMPA. While participating in an Anti-Racism Group, consisting of 16 people, called by his administration's Senior Deputy Director, the Plaintiff witnessed a Woman co-worker bullied and humiliated in a Group e-mail exchange. She was accused of making no sense by DC government employee Ivan Eaton, when making perfectly good sense. Her announcement to the entire group that she was exiting the e-mail exchange because a rule had been broken served as proof, she was made to feel unsafe to share her voice as a Woman within DC government without being misinterpreted and humiliated.

13.     On January 14, 2021, as the Plaintiff deemed this incident where he witnessed a Woman portrayed as nonsensical when she made perfect sense to be a threat to a dignified and humane work environment with reasonable conditions of employment, he sent an e-mail to the Anti-Racism Group, which included his supervisor and the agency's Senior Deputy Director, demanding the incident be addressed. The incident was not addressed.  Therefore, on February 24, 2021, the Plaintiff filed a report with the Department of Health's, Employee and Labor Relations Manager, pursuant to DC

government's Issuance 2019-8; Maintaining a Healthy Workplace: Anti-Bullying Policy.

14.     The Defendant failed to ensure the Plaintiff's work environment was decent, humane, and dignified, in violation of the CMPA, as the Plaintiff's report submitted to DOH Employee and Labor Relations Manager was not investigated in accordance with Issuance 2019-8, which provides:

> *"All District employees are expected to show respect for one another and immediately report instances of workplace bullying when they see it happening… Agencies and managers must demonstrate reasonable care to promptly address all claims of workplace bullying."*

15.     On February 23, 2021, before filing his official report with DC Health's Employee and Labor Relations Manager, the Plaintiff was informed that the Manager had questions to ask about the Anti-Racism Group and about a communication the Plaintiff wrote to DC government employee Ivan Eaton in December 2020. Plaintiff was advised to have his Union representation present.

16.     On February 24, 2021, while being interrogated by DC Health's Employee and Labor Relations Manager, the Plaintiff is subjected to further indecent, undignified, and unreasonable conditions of employment. The Plaintiff is asked nothing about his involvement in the Anti-Racism Group but is interrogated about a communication to Ivan Eaton outside of the Group. The Plaintiff is informed that as a condition of his continued employment, he must submit an affidavit denouncing any intent on killing, maiming, murdering, or injuring any DC government officials or employees.

17.     This request of February 24, 2021, from Management that the Plaintiff submit an affidavit that he was not intending on murdering or injuring any employee, deprived the Plaintiff of his dignity and brought harm to his professional reputation. The conditions placed upon Plaintiff's employment by Management were totally unreasonable as in no possible way would a careful investigation of the Plaintiff's communication find a threat to any DC employee. The Plaintiff wrote in part:

> *"You are allowed to arrive at work what 10 am, 11 am? And before rush hour traffic starts on 295, you are halfway back home to Baltimore! And you mean to tell me you see yourself as having an Overseer? You think you are victim of a Slave Master at HAHSTA? You see HAHSTA as a Plantation or as a racially charged environment? Really?... I am*

*recommending we do just as was done in South Africa. Have Conversations. Let us hear what people's problems are. Let us learn who caused them harm! Let us then make them whole and bring healing. IF we have such problems at HAHSTA that is."*

18.    On February 26, 2021, the Plaintiff learns of more damage to his professional reputation due to DC employee Ivan Eaton's retaliation scheme, when Plaintiff receives a call from his supervisor informing him senior Management: "*They told me you threatened to kill the man."*

19.    On March 1, 2021, the Plaintiff, after learning senior Management were spreading rumors that he had threatened to kill DC employee Eaton, he submits an addendum to his affidavit so the Defendant would act to clear his professional reputation and character from being impugned. This addendum included evidence in the form of an e-mail from Eaton, where Eaton informed the Plaintiff, before the Plaintiff reported Eaton for bullying, that he, Eaton, appreciated the Plaintiff.

20.    To further demonstrate to the Defendant that he was being retaliated against by Mr. Eaton, so that the Defendant would address Mr. Eaton's slanderous allegations, thereby safeguarding the Plaintiff's substantive due process entitlements, the Plaintiff submitted an assessment from Sherita Grant of the specific communication Mr. Eaton presented to Management in pretending to be threatened by the Plaintiff. The Plaintiff had worked closely with Ms. Grant for 16 years. It was Ms. Grant who advised the Plaintiff to work with her intimate friend, Mr. Eaton, as Mr. Eaton had been complaining to Ms. Grant about his interactions with the Plaintiff in the Anti-Racism Group. Ms. Grant's assessment of the Plaintiff's communication with Mr. Eaton is evidence of Defendant's gross negligence in not stopping Mr. Eaton from attacking the Plaintiff's character. Ms. Grant wrote:

> *"Baron, This is powerful! As two intellectual Black men, I hope you and Dr. Eaton can forge a better relationship and come together to help eradicate racism for our nation and not just this group. Just WOW!"*

21.    The Defendant's failure to prevent Mr. Eaton from slandering the Plaintiff's reputation was gross negligence and deprived the Plaintiff of substantive due process and of his interest in his

reputation. The Plaintiff clearly alerted the Defendant in his addendum to his affidavit:

> *"Ivan Eaton filed his revengeful, malicious claims after I brought to the attention of HAHSTA staff his blatant disrespect of a Black Woman, Janice Walker, manipulating and twisting her words, mischaracterizing her as making "no sense" before the entire group."*

22.    On April 28, 2021, the Plaintiff was subjected to further indignity and humiliation and was again hindered in the discharge of his job responsibilities. He was summoned to meet with Management to address allegations that Ms. Grant was accusing him of making her work environment hostile. And what made Plaintiff's work conditions so very unreasonable by being summoned to address Ms. Grant's allegations was the explanation given: *"Baron is angry at me because I don't see what Ivan did wrong to Janice."* Making the Plaintiff's work conditions even further unreasonable by being summoned to address Ms. Grant's childish allegation, with her motivation behind her allegation so obvious, was that it was impossible for the Plaintiff to have subjected Ms. Grant to a hostile work environment. The only contact Plaintiff could have had with Ms. Grant was if she willed as staff were working from home due to the coronavirus pandemic.

23.    On May 3, 2021, the Plaintiff informed the Defendant that his being confronted by Ms. Grant's obviously biased allegations evidenced further violations of his substantive due process and evidenced discriminatory treatment. The Plaintiff provides a copy of his cellphone log, showing that in his last conversation with Ms. Grant, it was she who called him on a Friday evening after work hours to chastise him, in a call lasting 79 minutes. The Plaintiff raised the issue with Management:

> *"For speaking up for Black Women, HAHSTA and DC Health is now engaging in viciously stereotyping Baron Bell, a heterosexual Black Male, as typical "Angry Black Man".*

24.    On May 19, 2021, the Defendant displayed reckless indifference to the Plaintiff's substantive due process protections. The Plaintiff learns from AFGE Local 2978 Shop Steward that she was informed by DC Health's Employee and Labor Relations Manager, that the Plaintiff's report against Mr. Eaton for bullying and harassment had been substantiated. But then the Shop Steward informs

the Plaintiff the Manager advised: *"Janice has gotten over it and moved on, so tell Baron that he should get over it and move on too."* Defendant relaying a message: "*get over it and move on*" showed gross negligence to the Plaintiff's concerns about his work environment. And Ms. Walker told no one she had *"gotten over it and had moved on".* The Plaintiff learned Ms. Walker informed Management she received no apology from Mr. Eaton but did not want to be made to feel as if she had to beg for one.

25.     On May 25, 2021, the Defendant exposes the Plaintiff to further harassment, humiliation, and unreasonable conditions of employment. The Plaintiff is obligated to a mediation meeting. And Management decides to have Mr. Eaton involved in this mediation along with Ms. Grant, a decision which demonstrates Management's awareness that Grant's allegations against the Plaintiff were part of her liaison with Eaton. Still, instead of safeguarding the Plaintiff from Grant's and Eaton's plot, the Defendant offers the Plaintiff as a sacrifice. The Plaintiff suffered listening to Grant's and Eaton's testimony disparaging his character. To demonstrate to Grant and Eaton that Management was taking *their* allegations of a threat to *their* work environment seriously, the two are asked would they feel safe working in the office if the Plaintiff was present. "No, [Plaintiff] is a liar", declared Mr. Eaton. The Plaintiff must suffer humiliation in listening to Ms. Grant testify of her alleged fear of Plaintiff's anger with Mr. Eaton during conversations, only for Ms. Grant to later admit the Plaintiff had long ceased speaking to her about Mr. Eaton. And in recalling during mediation a private conversation with the Plaintiff and employee Monique Green, where Ms. Grant became upset with the Plaintiff for calling Mr. Eaton her benefactor, Ms. Grant made a clumsy admission before Management how the benefits received by her from Mr. Eaton gave her motivation to conspire with him against the Plaintiff. Ms. Grant recalled before everyone, the Plaintiff's response: *"Look around your house";* when she asked the Plaintiff why he had referred to Mr. Eaton as her benefactor. The liaison between Mr. Eaton and Ms. Grant was so apparently obvious by their testimony, even the Employee and Labor

relations Manager advised the two to cease gossiping. Furthermore, during this mediation, the Plaintiff is asked upwards of three (3) times, even after he had already been subjected to submitting an affidavit that he had no intent on killing, maiming, murdering, or injuring DC Health employees; if he was planning physical harm to Grant or Eaton. As the mediation closed, Grant confessed the true reason for her allegations against the Plaintiff: *"Baron* [Plaintiff] *hurt my feelings".*

26.     That the Plaintiff was made to suffer a mediation where he was subjected to both Grant's and Eaton's slanderous allegations and implications was a total unreasonable condition of employment in violation of the entitlements defined in the CMPA that employees have reasonable conditions of employment where job tasks could be performed with dignity. Instead of acting to prevent employees Eaton and Grant from doing further damage to his character and reputation, the mediation session was no more than 2 hours concluded when the Plaintiff was again hindered in the performance of his job tasks, because he "*hurt someone's feelings".* The Plaintiff learns he was being summoned to yet another meeting to address Grant's and Eaton's malicious allegations.

27.     On June 24, 2021, Plaintiff once again put the Defendant on notice of his unproductive and now violently dangerous work environment. He writes an e-mail to HAHSTA's Deputy Director of Operations, to DC Health's Employee and Labor Relations Manager, and to his immediate Supervisor, HAHSTA Bureau Chief, in part:

> *"Moreover, I am the one who stands in need of protection here. If last month's testimony, plus all the evidence I have provided in this matter has not convinced management of where the threat and danger lie, I have nothing else to offer."*

28.     June 24, 2021, at the second mediation meeting, there is even more evidence of Grant's and Eaton's conspiracy and conniving.  The Defendant's failure to respond to this evidence by stopping Grant and Eaton from besmirching the Plaintiff's reputation constituted a gross violation by the Defendant to afford the Plaintiff substantive due process. After informing Management at the

conclusion of the first mediation meeting that she could resolve any issues she had with the Plaintiff, Grant is again lockstep with Eaton, both still claiming they are frightened with the prospect of returning into the office due to a fear of harm coming from an act by the Plaintiff.  Grant even begins to argue with the President of AFGE Local 2978, over a different matter yet concerning Mr. Eaton. During this argument, Ms. Grant recalls before everyone, how she and Mr. Eaton schemed to seduce the President to join her on a phone call, while Mr. Eaton listened in secret on another phone line to the entirety of the conversation.

29.     The Defendant, in subjecting the Plaintiff to four (4) meetings within a five-month period to acquiesce to Ms. Grant's and Mr. Eaton's disparaging and damaging portrayals, showed no concern whatsoever for the reasonableness of the Plaintiff's work conditions nor showed any concern with the humaneness of his work environment. Furthermore, the Defendant's acquiescence to the plot of Grant and Eaton showed total indifference to the Plaintiff's personal and professional reputation. In fact, in his last phone conversation with Ms. Grant, she disclosed that Management interviewed her as early as January 2021 about the Plaintiff's communication which Mr. Eaton pretended to be threatening. If Defendant had been concerned with the reasonableness of the Plaintiff's work conditions, and diligent with safeguarding his reputation, the Defendant would not have continued to hinder the Plaintiff with Grant's and Eaton's defamatory allegations, especially after the Plaintiff provided management direct evidence that only after reporting Mr. Eaton for humiliating a DC government employee who is a Woman, did Ms. Grant and Mr. Eaton begin to levy malicious allegations that the Plaintiff was a threat to cause an act of violence in the workplace. This evidence was Ms. Grant's e-mail to the Plaintiff, that she found his 2020 communication with Mr. Eaton *"powerful"* rather than threatening as Mr. Eaton pretended.

30.     On July 9, 2021, the Plaintiff puts the Defendant on notice that his substantive due process protections have been violated. He files a 17-page complaint with the DCHR, copying DC Health

and the Mayor's Office. He requested DCHR investigate DC Health so that his work conditions be safe, productive, and reasonable, and his reputation would not suffer the indignity of being stereotyped and stigmatized as a violent menace. DC Health had made no official findings, only facilitated rumors the Plaintiff was threatening to commit acts of violence despite all the Plaintiff's denials he was intending violent harm. The Plaintiff writes to DCHR in part:

> "I now request DC Department of Human Resources to take over this complaint as discussions with my family and loved ones have convinced me that not only have I become the victim of harassment in the workplace and my professional character disparaged and maligned, but now my very life may be in jeopardy as well."

31.    In his plea to DCHR, the Plaintiff was emphatic that substantive rights the CMPA entitles all employees were being violated by Defendant's failures to address his reporting this act of bullying:

> "How can Women thrive in an environment where even as Managers, they can be characterized as 'nonsensical' in a group dialogue with other Managers and the agency's Senior Deputy Director no less? And I too want to work in an environment where I feel the agency is true to its commitment in being an inviting and inclusive workplace. I do not want to work in an environment where bullies go unpunished and are not reprimanded."

32.    In his plea to DCHR, the Plaintiff also expressed his deeply held religious convictions which motivated him to report a Woman being disrespected and humiliated in the workplace:

> "And I am not afraid of losing my job. My only fear is returning to my Lord having witnessed injustice and oppression without making such known to those who had the power to correct it."

33.    DCHR never even acknowledged the Plaintiff's plea, demonstrating reckless indifference towards its duty to provide the Plaintiff with reasonable conditions of employment where he could discharge his duties unhindered and with dignity as legislated in the CMPA. With there being no official findings repairing the harm done to the Plaintiff's personal reputation after haven been besmirched and impugned as a person who threatens with violence, and without disciplinary action taken against employees portraying him as violent, the Plaintiff was left vulnerable to a real physical attack from Mr. Eaton or Ms. Grant under the guise of self-defense.

34.     On July 9, 2021, the Plaintiff informs his supervisor that he cannot perform in such a hostile

work environment. He would use personal leave and then request unpaid extended leave until DCHR

intervened to make his work environment safe and humane, free from rumors and threats of violence.

35.     On July 27, 2021, the Defendant again violates the Plaintiff's substantive due process, as the

Plaintiff's unpaid extended leave request is denied, and the Defendant directs the Plaintiff to report

to a hostile work environment without any of his workplace safety concerns being addressed.

36.     On July 28, 2021, the Plaintiff makes yet another plea to the Defendant to address his safety

concerns and to safeguard his reputation before directing him to report to the office. The Plaintiff

writes in part:

> *"The reason for my absence is that I do not feel safe to return to the DC Government*
> *workspace. And this not solely because of the actions of Mr. Ivan Eaton and Ms. Sherita*
> *Grant, but also because how the Management of DC Health and HAHSTA have allowed them*
> *to malign, slander, and impugn my character, now even projecting the idea of violence into*
> *the workplace... Beyond the threat I feel for my physical and professional safety, I now feel*
> *Management has no appreciation for my very own humanity".*

37.     On July 28, 2021, the Defendant again shows reckless indifference to the reasonableness of

the Plaintiff's work conditions by charging him Absent Without Official Leave (AWOL). And this

action of the Defendant violated the employee protections under the due process procedural

provisions of the CMPA. The Plaintiff was not notified that he could officially respond to this adverse

action as is an employee privilege the CMPA guarantees.

38.     On August 2, 2021, the Plaintiff sends communication to DC Health Human Resource

Officer, John Parham, raising with Defendant the question if disparate treatment be the reason the

Defendant had not addressed his complaints regarding his indecent, inhumane, unsafe, and

unreasonable conditions of employment. Plaintiff notified the Defendant:

> *"My complaint was filed in February 2021. Till this moment, I have heard nothing! None of*
> *the provisions of DCHR Issuance I-2019-8 have been adhered to. Apparently, either these*
> *directives are for show or, Management for some reason unbeknownst to myself, refuses to*

*adhere to these directions in my case. Hence, this is why I do not feel safe in the DC Health workspace until my complaint has been addressed in accordance with DCHR's own policies."*

39.    Also on August 2, 2021, the Plaintiff provided Defendant with an assessment from his physician, notifying the Defendant how its indifference to the reasonableness of the Plaintiff's work conditions had a negative impact upon his physical and emotional health:

> *"It is my medical opinion that Baron Bell, has been experiencing significant stress from a hostile work environment that is stemming from a feeling of poor response to HR complaints".*

40.    On August 3, 2021, the Plaintiff again informs Management of his willingness to return to work but that his unsafe and unreasonable conditions of employment would not allow him to perform his tasks unhindered. The Plaintiff implores the Defendant to protect his substantive due process protections, writing in part:

> "*More to the point, I really had no intent on using a specific amount of leave. It is not as if I do not want to be at work. I am waiting upon action be taken by the Management of DC Government to where I feel safe at work and that I can perform to high standards."*

41.    In this August 3, 2021, communication with Management, the Plaintiff also raises the issue with Defendant how its failure to address his substantive due process was being done in reckless disregard of the impacts upon the Plaintiff's mental health and emotional well-being. The Plaintiff writes in part:

> *"Mr. Fox, I understand you have an advanced degree in behavioral or mental health. And, you know me. Then, of course you are aware, I am not the caliber of person that will be able to function in an environment or setting where my character can be maligned, impugned, and besmirched without acknowledgement and then corrective action. And the projection of violence establishes for me a safety concern."*

42.    On August 9, 2021, the Defendant does appear to show concern with the reasonableness of the Plaintiff's work conditions. DC Health Human Resource Officer, John Parham, informs the Plaintiff of a detail opportunity with the D.C. Mayor's gun violence prevention program.

43.    On August 13, 2021, Plaintiff was contacted by DCHR. Plaintiff is offered a detail he had not

discussed with Officer Parham. When learning the Plaintiff had not discussed this specific detail with Mr. Parham, DCHR removed the Plaintiff's name from the candidates list.

44.     On September 9, 2021, Plaintiff learns DCHR had not been given a "green light" to send additional employees to the detail which DC Health Human Resource Officer, Mr. Parham told the Plaintiff was available.

45.     On December 14, 2021, the Defendant further violates the due process procedural provisions of the CMPA against the Plaintiff when the Defendant sent him a Proposed Separation Letter. The CMPA mandates mitigating circumstances be considered when proposing an adverse employment action. Yet, the Defendant's proposed separation to the Plaintiff amazingly lists no mitigating circumstances.

46.     The Defendant's Proposed Separation shows reckless indifference to the Plaintiff's work conditions and demonstrates a wanton violation of the CMPA. Not only were mitigating circumstances not considered, but the Plaintiff's professional reputation is further besmirched and impugned. He is accused of job abandonment, his supervisor stating: *"As a solid performer of his work, it is difficult to understand his level of disregard for following instructions."*

47.     Moreover, in the Defendant's Proposed Separation, the Plaintiff's reputation is further disparaged, as he is falsely accused of turning down a detail opportunity, *"due to suitability to the needs of the selected position."* The truth, however, was the detail DC Health's Human Resources Officer, John Parham, discussed with the Plaintiff was unavailable.

48.     On December 23, 2021, the Plaintiff answers the Defendant's proposed separation, once again notifying the Defendant of his hostile and dangerous work environment. The Plaintiff writes in part:

> *"This projection of me, this portrayal of me, as a person of violence presents an imminent safety risk for me and to my mental and emotional well-being. It causes a feeling of being feared by my co-workers, being watched by my Supervisors, and vulnerable to a physical*

*assault in retaliation for the filing of my complaint under the guise of an act of self-defense, it haven been established I am a person of violence".*

49.    The Plaintiff in his answer also puts Defendant on notice of its violation of the due process

provisions of the CMPA which mandate mitigating circumstances be considered. The Plaintiff writes:

*How many in the history of DC Government have been asked to return to such an environment under the facts presented?" And now, instead of responding to my safety concerns, the Management of DC Health has prepared a Proposed Separation which falsely asserts that there are no mitigating circumstances in this case and misleadingly implies that Mr. Bell just up and abandoned his job. Thus, instead of listening to Mr. Bell and addressing his safety concerns, DC Health would rather terminate his employment under false pretense and thereby cause Mr. Bell further economic and emotional harm, while yielding the power of the same Black Women whose authority Mr. Bell so passionately demanded be recognized and respected!"*

50.    The Plaintiff also raised if his sexual orientation factored in the Defendant's total indifference

to acknowledge, let alone address, his workplace safety concerns. The Plaintiff asks:

*"I ponder, what would have been the outcome here if a homophobic slur in the workplace had been uttered?"*

51.    In his answer to Defendant's proposed separation, the Plaintiff also informs the Defendant he

feels DC Health Management discriminated against him by failing to address his report of an act of

bullying, disrespect, and humiliation of a Woman in the workplace, because he is a male:

*"The total and deliberate disrespect of Women by Men I find offensive! And Mr. Eaton's calculative bullying and Ms. Walker's response to it before everyone was further offensive to me. So why then was Mr. Eaton not even made to apologize? "Get over it and move on" was Mr. Memnon's message to me through my Union Representative? I feel as if I was discriminated against because I was a Man filing a complaint involving gender bullying of a Woman. Bullying of Women in the workplace should be as equally offensive to Men as well as to the Women who are the victims of such vile behavior."*

52.    The Defendant violated the due process procedural provisions of the CMPA by failing to ever

send the Plaintiff the hearing officer's recommendation and the deciding official's final decision.

According to DC Municipal Regulations, when an employee answers a proposed separation, the

employee is to receive the hearing officer's recommendation in 30-days and a decision 45 days

thereafter.

53.     On June 2, 2022, his first communication from DC Health in six (6) months, the Defendant admits to the Plaintiff his due process employee protections were violated, however, the Defendant mentions nothing about the Plaintiff's pleas regarding his working conditions being made reasonable. The Plaintiff is instructed by the proposing official, his supervisor, to report to work on June 7, 2022, without prejudice. The reason for the proposed separation being rescinded is claimed to be discovery of a *procedural error*, which apparently took six (6) months to discover.

54.     On June 3, 2022, the Defendant violates the due process provisions of the CMPA against the Plaintiff again, as the Plaintiff receives a directive he may *not* return to work, but without ever being informed why and without having been given an opportunity to respond.

55.     On June 6, 2022, a sheriff arrives at the Plaintiff's home and presents him with a Peace Order Petition. DC employee Ms. Grant accused the Plaintiff of stalking and harassing for addressing an e-mail to her on June 1, 2022, which was the day before the Plaintiff was instructed to report back to work. The Plaintiff learns on the day he was directed by the Defendant to report to work, Ms. Grant shared with DC Health Director LaQuandra Nesbitt, the Plaintiff's e-mail. Ms. Grant claimed she was fearful of interaction with the Plaintiff and was unclear what the Plaintiff intended by things expressed in his e-mail. Ms. Grant portrayed the Plaintiff as unhinged and complained that the Plaintiff's job duties gave him access to her, but Management had done nothing to protect her.

56.     That the Defendant was given the Plaintiff's e-mail written to Ms. Grant and Ms. Green serves as evidence that at the level of the Director of DC Health, the mitigating circumstances which were violations of the Plaintiff's substantive due process protections was known. Even the Plaintiff's dismay, shock, and emotional anguish with Ms. Grant publicizing to DC Health she feared the Plaintiff was going to bring physical harm to herself and DC employee Ivan Eaton in the workplace,

the Defendant was made aware of. The Plaintiff wrote: *"Violence? Violence? Violence? Na, ugh ugh"*.

57.    Director Nesbitt's June 2, 2022, exchange with DC employee Sherita Grant showed discrimination against the Plaintiff in favor of Ms. Grant and a reckless disregard for the Plaintiff's employment protections provided by the CMPA. It was the Plaintiff who had been seeking assistance from Directive Nesbitt's administration for protection against Ms. Grant. Yet, the Director readily and immediately pledged her assistance to Ms. Grant against the Plaintiff:

> *"I will need to confidentially seek guidance from DC Health General Counsel, Mr. Phillip Husband, regarding the best way to proceed in this matter".*

58.    Director Nesbitt's promise of assistance to Ms. Grant was an egregious violation of Plaintiff's due process protections. And Ms. Grant gave Director Nesbitt evidence that Ms. Grant had animus and ill-will against the Plaintiff and thus was motivated to falsely portray the Plaintiff as a threat. Ms. Grant discloses to Director Nesbitt:

> *"At the direction of management, early this year, I went [to] the EAP to discuss my physical and mental concern with this individual [Plaintiff]."*

59.    Director Nesbitt's promise of assistance to Ms. Grant was additionally egregious as she acknowledged the Plaintiff's e-mail was purely private and unrelated to the performance of any job responsibilities:

> *"I am; however, concerned that you are being contacted by [Plaintiff]via his personal e-mail, outside of his professional role in HAHSTA".*

60.    On June 7, 2022, the Plaintiff acknowledges the Defendant's directives that he reports to work then instructing him not to report to work. The Plaintiff informed the Defendant the directives were in violation of the due process procedural provisions of the CMPA and that the Defendant's violations of substantive due process made it impossible for him to return to the office. Plaintiff asks:

> *"Do HAHSTA top managers still think I wish to kill Mr. Eaton? I've not heard a word. Thus,*

*I cannot perform my work effectively in such an environment, being stigmatized as a violent killer.*

61.    On June 13, 2022, the Plaintiff learned in the District Court of Prince George's County Maryland what Director Nesbitt determined was the "best way" to address Ms. Grant's allegations against him. As opposed to guaranteeing the Plaintiff's due process protections afforded him by the CMPA and DC Municipal Regulations, the Defendant sought to criminalize the Plaintiff. Ms. Grant testified:

> *"So, when I sent the e-mail to the Director, she forwarded it to our think Attorney General, Phil Cousins [Phillip Husband] of the Department of Health…So the Attorney General forwarded to the district detectives. So the detective called me on—called me and he read it and he went over it and was asking questions. His name is Detective David Carter from the first District of DC. And he informed me, based on the e-mail and its content, that it would be for me, that I needed to do what I had to do to protect me and my family as it relates to, like I said, Mr. Bell had—did not threaten me."* [Maryland District Court Transcripts, Pg 8.]

62.    On June 17, 2022, the Plaintiff, deeply troubled by Director Nesbitt promising Ms. Grant assistance against him, as it were he who had been pleading Defendant's protection from Ms. Grant while AWOL 11 months, sends the Director communication, copying Senior Deputy Director of HAHSTA, Clover Barnes, and his supervisor, Bureau Chief, Anthony Fox. The Plaintiff begins by making Director Nesbitt aware of his very personal relationship with Grant and thus the very personal nature of his private e-mail.

> *"The opening paragraph above is the result of one of countless conversations in 17 years between myself and Ms. Grant, whether in the offices of HAHSTA, by e-mail, or by phone, or at her house. And now, I read where you are concerned I am contacting her by personal e-mail outside of my professional role in HAHSTA?"*

63.    In this June 17, 2022, communication the Plaintiff reveals to Director Nesbitt how the Peace Order petition form completed by Ms. Grant did not make the claim the Plaintiff threatened her nor that she was afraid of any physical harm coming from the Plaintiff.

64.    The Plaintiff attaches to this June 17, 2022, communication with Director Nesbitt, a private

e-mail to him written by Grant in May of 2021, requesting a private conversation with the Plaintiff to repair their relationship. However, as the Plaintiff then illustrated to the Director, Grant claimed on the Peace Order petition that in May of 2021, the Plaintiff was told not to contact her in any form. Therefore, the Director of DC Health was made fully aware that Ms. Grant had no reservations with making knowingly false statements against the Plaintiff, even in a legal matter. Thus, Director Nesbitt should have suspected Ms. Grant was providing false testimony to DC Health regarding the Plaintiff.

65.    The Plaintiff further informs the Director of DC Health in his June 17, 2022, e-mail to her, of his unreasonable conditions of employment at DC Health and of his grave concerns with being stereotyped as a Man of violence:

> "Ms. Grant's latest actions have bolstered my alarm I am unsafe at DC Health. An atmosphere has been created where Ms. Grant and Mr. Eaton are so comfortable with continuing to slander me, placing me in great harm, and without any consequences. Three times, I have "private communications", with not even a thought of harming either of them in anyway. And they report to Management by my words, they are afraid I may physically harm them! Now being given straight access to the Director in doing so".

66.    The Plaintiff even raises with the Director the disparate treatment he had been suffering:

> "Finally, Dr. Nesbitt, I could not help but notice where you inform Ms. Grant of your goal to ensure that you take the appropriate and necessary actions to provide a safe workplace environment for your DC Health team members. Is it something peculiar to me then? Perhaps, I do not fit in any of the Groups HAHSTA and DC Health preaches against their being stigmatized?"

67.    The Plaintiff then makes yet another plea, this time to none other than DC Health's Director:

> "Near a year now, I have been begging and pleading for DC Health to take action to make me safe from the lies, slander, and character assassination from Mr. Eaton and Ms. Grant…DC Health has left me unprotected from the shenanigans of Sherita Grant and Ivan Eaton. My ardent desire was to be able to work in an environment free from Women being bullied, humiliated, and ridiculed. I wanted my work environment free from Women's Voices being deliberately misinterpreted in an effort to portray them as being nonsensical when actually making PERFECT SENSE! I was demanding Women at DC Health be shown RESPECT!"

68.    Finally, in this June 17, 2022, correspondence with Director Nesbitt, the Plaintiff further

alludes to his intent to file a lawsuit against DC Health:

> *"I am sure at least a few jurors may wonder, how did DC Health determine to take action against Mr. Bell for sending the communication, yet be totally silent and inactive to its contents?...Dr. Nesbitt on that note, it is out of respect to you as a Woman and out of great respect to your position as Director that I wanted you to know personally from me that I am in possession of your counsel and pledge of assistance to Ms. Grant."*

69.    On July 6, 2022, Director Nesbitt announces to the public her resignation from DC Health.

70.    On July 20, 2022, the Plaintiff receives in the mail a Final Summary Removal Notice from Director Nesbitt.

71.    The Final Summary Removal Notice accuses the Plaintiff of:

*a*    conduct immediately hazardous to the agency or other employees (6-B DCMR 1616.2(b));

*b*    conduct detrimental to the public health, safety, or welfare (6-B DCMR 1616.2(c));

*c*    off-duty conduct that adversely effects the employee's performance or trustworthiness (6-B DCMR 1607.2(a)(5)); and

*d*    use of abusive offensive, unprofessional, distracting, or otherwise unacceptable language, gestures, or other conduct; quarreling; creating a disturbance or disruption; or inappropriate horseplay (6-B DCMR 1607.2(a)(16)).

72.    Director Nesbitt informs in the Final Summary Removal:

> *I agree with the findings and recommendations of the Hearing Officer to uphold the Summary Removal action.*

73.    Director Nesbitt claims in the Final Summary Removal:

> *"You sent an e-mail to your co-worker, Sherita Grant, and included other DC Health employees on your e-mail, making threats to Ms. Grant's personal safety. Your conduct of making threats to another DC Health employee via e-mail cannot be tolerated. Your decision to send an e-mail containing threats to another DC Health employee are unacceptable and constituted an immediate threat to the employee".*

74.    Director Nesbitt's justification for taking adverse action against the Plaintiff was libelous defamation and therefore a violation of 6-B DCMR. There was no threat to the personal safety of Grant or anyone in the Plaintiff's e-mail. The Plaintiff wrote to the Director informing her of his personal 17-year relationship with Grant. The Plaintiff informed the Director that Grant testified in Court that the Plaintiff did not threaten to physically harm her. Moreover, Director Nesbitt was aware

that the investigation which she called for, conducted by the Metropolitan Police Department into the contents of the Plaintiff's e-mail, did not find he threatened anyone.

75.    Director Nesbitt scolds the Plaintiff in her Final Summary Removal, under the factor 'Impact On Agency Reputation', acknowledging the Defendant's false proffer for the Plaintiff's termination would give him a stigma that would bar his employment by any other governmental agency which received HUD funding, thereby interfering with his liberty. Director Nesbitt scolds the Plaintiff:

> *"Additionally, as you supported a federal grant, if HUD were to become aware of your conduct, it could undermine the continuation of the grant and future grants the Agency may apply for."*

76.    Director Nesbitt acknowledges in her Final Summary Removal her libelous accusation used to justify terminating the Plaintiff's employment stereotyped, stigmatized, and defamed the Plaintiff as a near violent criminal. The Director further chastises the Plaintiff:

> *"You do not have to be told that you cannot email threats to the personal safety of your co-worker. Making threats can be considered as criminal conduct."*

77.    Director Nesbitt further claims in her Final Summary Removal:

> *"You have not reported for duty or contacted your supervisor regarding your duty status since July 2021, but still chose to contact a co-worker via e-mail to make threats to their personal safety on or about June 1, 2022".*

78.    Director Nesbitt's statement about the Plaintiff not being in contact with DC Health about his duty status since July 2021, was so woefully false, it underscores the discrimination and retaliation the Plaintiff suffered from the Defendant and the Director. In December 2021, the Plaintiff addressed his duty status in detail when answering the Defendant's Proposed Separation. And on June 7, 2022, the Plaintiff sent correspondence about his duty status to the Senior Deputy Director of HAHSTA, to his supervisor, and to DC Health Human Resources Officer. Moreover, on June 17, 2022, only a month before she executed her Final Summary Removal Notice, the Plaintiff sent a communication pleading directly to Director Nesbitt about his duty status.

79.    Director Nesbitt claims in her Final Summary Removal Notice:

*"No mitigating circumstances have been identified".*

80.    Director Nesbitt violated 6-B DCMR by claiming there were no mitigating circumstances leading to Plaintiff's termination. The Director was aware when deciding to take adverse action against the Plaintiff, that he was AWOL a year but not terminated. Impossible without there being mitigating circumstances. Moreover, the sole proffer the Defendant gives for terminating the Plaintiff's employment was an e-mail wherein the mitigating circumstances were explained in detail.

81.    Director Nesbitt acknowledges in her Final Summary Removal:

*"You did not receive any adverse or corrective actions within the last three (3) years".*

82.    Director Nesbitt acknowledges in her Final Summary Removal:

*"There have been no complaints about your work performance".*

83.    The Final Summary Removal executed by DC Health Director Nesbitt proves the Plaintiff's termination had no nexus cognizable as a personnel issue.

84.    The Final Summary Removal executed by DC Health Director Nesbitt, confirming the Plaintiff had not received any adverse or corrective actions, nor had there been any complaints about his work performance, is also proof that his being charged AWOL for a year at the time of his termination had no nexus to any performance deficiency cognizable under the CMPA.

85.    Director Nesbitt terminating the Plaintiff, solely on the evidence of his e-mail to Sherita Grant and Monique Green, proves Defendant's violation of the First Amendment and the DC Whistleblower Act. The Plaintiff declared in his e-mail:

*"They don't want the Truth to be known so, they actually tried to fire me! Even emotionally messing with me, saying they don't know why I aint coming to work. Not acknowledging my cause and concerns. And I really lit em up then! Now they got a dilemma. Oh. But, the Truth is going to get out! My lawsuit will be filed in a few days now...But that is not the half. You*

*better know the entirety of DC Government and the City will know… And my lawsuit is not just about "what Ivan did to Janice". My lawsuit is about clearing my name and making my work environment safe. Safe from a maniacal, narcissist who is trying to set me up by physically harming me, so he brings violence into the picture to set up his act of revenge. And not only DC Health I will be suing. And, when this gets to court, I will have my lawyer depose everybody in the office to speak about the real THREAT in HAHSTA's work environment!!!!! I told Memnon, VIOLENCE in NO WAY accomplishes my goal! And my goal is, that DC Government ensure that RESPECT BE SHOWN A BLACK WOMAN! Then, I submitted EVIDENCE into the official record of no good, dirty, filthy liars! In court, my lawyer going to demand to see what DC Government did with that evidence and if DC Government punished those who may have provided false testimony in an official investigation…Sherita, this for me is a Divine mission. DC Government is going to address what [Eaton] did."* [Caps and Punctuation from the original].

86.    Director Nesbitt terminating the Plaintiff, solely on the evidence of his e-mail to Sherita Grant and Monique Green, also proves Defendant's violation of the First Amendment and District of Columbia HRA Act as the Plaintiff explained to Ms. Grant how his e-mail was a central part of his religious expression. Plaintiff writes:

*"My mission is accomplished. I have answered your questions. And I have made you aware of my response to your harm done to my character and professionalism and my physical safety in the workplace as well. Therefore, until we meet in a court of law, I pray you will be confident in your TRUTH. For when we have no fear of TRUTH then we are prepared to meet our Lord on the Day of Reckoning… Sherita, even though you have now proven yourself to be a danger to me and family, I'm still going to look out for you! Allah is always watching. What we do we must answer for."*

87.    On July 31, 2022, Defendant was notified by Plaintiff's Attorney that Plaintiff never received a Summary Removal Notice in violation of DC Municipal Regulations. DC Health was requested to rescind the Final Summary Removal specifically so the Plaintiff's *"due process"* employee rights pursuant to the CMPA not be violated or to provide proof he received the Summary Removal Notice.

88.    DC Health again deprived the Plaintiff of Fifth Amendment protections, never responding to the Plaintiff's request he be afforded his due process right of response to his removal in accordance with the CMPA and as explicitly enumerated in District of Columbia Municipal Regulations.

89.    The Defendant's violations of substantive and procedural due process were willful and intentional as the e-mail exchange between Director Nesbitt and Ms. Grant served upon the Plaintiff

along with the Peace Order petition reveals. Director Nesbitt makes a telling admission:

> *"Also, I think it is important for you to know that when I became aware of the unauthorized anti-racism group in HAHSTA, I intervened quickly. Unfortunately when the HAHSTA group was launched using Microsoft Teams chat groups and peer facilitators, it fostered an environment where personal attacks occurred and many staff did not feel safe sharing their views and perspectives, staff were not clear on the goals and objectives of the group, and some staff began to feel threatened by others. I took steps to suspend the activities of the group, administer disciplinary action where appropriate and implement a more constructive group to address racism agency-wide."*

90.    Director Nesbitt's communication with Grant reveals as Director, she was aware of all that which had transpired in the Anti-Racism Group. The Director informs Grant that she administered disciplinary action where appropriate. Clearly, it was the case that the Director of DC Health did not deem it *"appropriate"* for DC Health to address the Plaintiff's myriad pleas stemming from the Anti-Racism Group. The Plaintiff asserts, as Director Nesbitt did not deem it appropriate to address his concerns with his conditions of employment, the Director willfully violated the First and Fourth Amendments and other laws, to circumvent the Fifth Amendment to rid the Plaintiff of being a problem for her and Ms. Grant. From his e-mail, the Director realized the Plaintiff would not cease in his just cause. Thus, for demanding Women working for DC government be treated with dignity and respect, the Defendant defamed, stereotyped, and stigmatized the Plaintiff as an angry, menacing, violent, and threatening Black male.

## V PRESENTATION OF COUNTS

### COUNT I
### Violation of the First Amendment Right to Free Speech and Exercise of Religion 42 U.S.C. § 1983

91.    Plaintiff Bell adopts and incorporates by reference the allegations of the preceding paragraphs as if set forth fully herein.

92.    The Plaintiff avers the Defendant violated the protections afforded by the First Amendment by terminating the Plaintiff's employment for private speech, in the form of an e-

mail, where the Plaintiff spoke on a matter of public concern and was engaged in religious expression. ¶¶ 88, 89. As pretext for the Defendant's unlawful act, the Plaintiff was libelously accused of speech threatening the personal safety of a DC government employee. ¶75.

93. First Amendment claims regarding sanctions against an employee from an employer for speech involve engagement in a four-element inquiry. The first two elements raise questions of law while the last two elements raise questions of fact to be left to the jury. *Thompson v. DC*, U.S. District Court of Appeals No. 04-7106, (2005). Those questions of law are: (1) did employee speak on "a matter of public concern"; and (2) whether the governmental interest in "promoting the efficiency of the public services it performs through its employees" outweighs employees "interest, as a citizen, in commenting upon matters of public concern, and the interest of potential audiences in hearing what [he] has to say." *Id*.

94. The facts of the instant case are that the Plaintiff spoke on a matter of public concern. This matter was bullying of Women in the workplace and a failure of government to protect employees from being retaliated against for reporting bullying in the workplace. ¶88. That the Defendant has an Anti-Bullying Issuance evidences its acknowledgement that bullying, particularly of Women in corporate and government workspace, is a public concern.

95. As for the second element of a First Amendment claim involving an employer acting against an employee; whether the governmental interest in "promoting the efficiency of the public services it performs through its employees" outweighs employees "interest, as a citizen, in commenting upon matters of public concern, and the interest of potential audiences in hearing what [he] has to say". In the instant case, there is no evidence the Defendant had an interest in punishing the Plaintiff which outweighed the public's interest with their government's failure to address reports of Women being bullied and humiliated in the government workplace. Neither is there any evidence that the Defendant

had a greater interest than the public's interest in employees being protected from retaliation when reporting Women being bullied while in the employee of the people's government. It is evident Director Nesbitt could show no interest which outweighed the public's interest, as the Director found it necessary to fabricate a reason for terminating the Plaintiff, that he threatened violence. ¶¶73-74.

96.    The questions generally left for the jury to decide are: (1) did the government employee demonstrate that his or her protected activity was a substantial or motivating factor in prompting the adverse personnel act. *Ramey v. U.S. Marshals Serv*., 755 F. Supp. 2d 88, 94 (D.D.C. 2010) (citing *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007); and (2) would the government have reached the same action regardless of the protected speech. *Thompson v. DC*, U.S. District Court of Appeals No. 04-7106, (2005).

97.    As for the third element of a First Amendment claim involving an employer acting against an employee; did the government employee demonstrate that his or her protected activity was a substantial or motivating factor in prompting the adverse personnel act. This element was met in the instant case as the Defendant's Final Summary Removal Notice written by Director LaQuandra Nesbitt, reads she terminated the Plaintiff in careful consideration of the Summary Removal Notice, which was written by the Director herself, and the hearing officer's report. Both documents recommended termination of the Plaintiff solely because of his written communication wherein he mentioned his intent to sue the Defendant for violations of policy and law, particular the Defendant's mishandling of the Plaintiff's complaint filed in accordance with DC government's Anti-Bullying Policy. The hearing officer writes in pertinent part:

> *"Although he used a personal e-mail account to send his June 1, 2022 email to Ms. Grant's personal email account, his email referenced District Government business, in particular his objections to the manner in which certain HAHSTA matters are conducted."*

98.    As for the fourth element of a First Amendment claim involving an employer acting against

an employee; would the government have reached the same action regardless of the protected speech. In the instant case, the Final Summary Removal Notice contains Defendant's acknowledgment that the Plaintiff was AWOL, yet there were no prior disciplinary concerns nor performance deficiencies in his employment. ¶¶ 78, 82-83. Defendant's acknowledgement was a tacit admission that the Plaintiff was AWOL because Defendant was aware that there was no legal basis to terminate his employment. Thus, without having received his private speech in the form of an e-mail, the Defendant would not have reached termination of the Plaintiff.

*Freedom of Religion and Religious Expression*

99.     Religious expression cannot violate the Establishment Clause where it is purely private. *Capitol Square Review and Advisory Bd. V. Pinette,* 515 U. S. 753 (1995).

100.     The Plaintiff's avers the Defendant deprived him of the protections afforded by the First Amendment by subjecting him to adverse action for a private e-mail exchange where language used in the e-mail clearly identified the communication as an exercise of religious expression. ¶87.

*Freedom of Taste and Style in Speech*

101.     In Cohen, the Supreme Court of the United States set forth the precedent: "…it is nevertheless often true that one man's vulgarity is another's lyric. Indeed, we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual." *Cohen v. California*, 403 U.S. 15 (1971).

102.     The Plaintiff asserts his Freedom of speech was further violated by the Defendant in finding that his private and personal e-mail to Grant was: "use of abusive offensive, unprofessional, distracting, or otherwise unacceptable language, gestures, or other conduct; quarreling; creating a disturbance or disruption; or inappropriate horseplay (6-B DCMR 1607.2(a)(16))". ¶71. The Plaintiff

was protected by the First Amendment from the Defendant judging the *"taste"* and *"style"* of the Plaintiff's purely private speech with someone whom the Defendant knew the Plaintiff had countless private conversations with ¶¶ 18, 21, 23, 62, then claim the Plaintiff's speech was a violation of employee policies pertaining to public speech or speech while on duty. Moreover, the Plaintiff's e-mail contained direct quotes from DC employee Sherita Grant, even involving quotes of hers speaking of subjecting business partners to physical acts. If the Defendant's claims for taking adverse action against the Plaintiff were genuine, it would have been direct quotes repeated in the Plaintiff's private e-mail from Ms. Grant which would have moved the Defendant to adverse action against her.

103.    "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343 (2003), quoting *Watts v. United States*, supra, at 708.

104.    The Plaintiff asserts the Defendant's proffer that he threatened the personal safety of Grant by e-mail was a deliberate false statement used as a pretext to deprive him of the protections afforded by the First Amendment. There were no statements in the Plaintiff's e-mail where he expressed intent to commit an act of unlawful violence towards Grant or anyone. And the Defendant was aware its justification for terminating the Plaintiff was false, as an investigation into the Plaintiff's e-mail by the Defendant found the contents of the Plaintiff's speech contained no threats. ¶ 61.

*Unconstitutional Policy or Custom*

105.    The Supreme Court has held that a single action can represent municipal policy where the acting official has final policymaking authority over the "particular area, or . . . particular issue*."* *McMillian v. Monroe Cty.*, 520 U.S. 781, 785 (1997).

106.    Plaintiff Bell was summarily removed from DC government by none other than DC Health

Director, LaQuandra Nesbitt, ultimately and personally, when the Director received from DC government employee Sherita Grant, an e-mail written by the Plaintiff. Director Nesbitt, as an agency head in the Executive Services, appointed pursuant to § 1-523.01 of the D.C. Code, is responsible for assisting the Mayor in advancing program responsibilities of the District government pursuant to § 1–610.51. As the Director, only she had the authority granted by 6-B DCMR § 1616.3 to execute a Summary Removal. It was Director Nesbitt herself who wrote the Final Summary Removal Notice sent to the Plaintiff, writing: "*I agree with the findings and recommendations of the Hearing Officer to uphold the Summary Removal action. In making my decision, I considered the following factors:.*" No other official at DC Health had oversite of Director Nesbitt's illegal adverse action to remove the Plaintiff from employment. *City of St. Louis v. Praprotnik*, 485 U.S. at 145 (1988).

## <u>COUNT II</u>
### Violation of the Fourth Amendment Right to Privacy and to be Secure Against Unreasonable Searches and Seizures 42 U.S.C. § 1983

107.    Plaintiff Bell adopts and incorporates by reference the allegations of the preceding paragraphs as if set forth fully herein.

108.    The Plaintiff avers the Defendant violated the expectations of privacy protected by the Fourth Amendment, by publicizing his private speech in a false light. Moreover, the Plaintiff avers the Defendant violated protections afforded by the Fourth Amendment prohibiting unreasonable seizure of personal property.

109.    The Fourth Amendment protects not only property interests but certain expectations of privacy as well. *Katz v. United States*, 389 U. S. 347, 351. Thus, when an individual "seeks to preserve something as private," and his expectation of privacy is "one that society is prepared to recognize as reasonable," official intrusion into that sphere generally qualifies as a search and requires a warrant supported by probable cause. *Smith v. Maryland*, 442 U. S. 735,740.

110.    An act diminishing privacy interest does not eviscerate privacy interest. "A person does not surrender all Fourth Amendment protection by venturing into the public sphere. To the contrary, "what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." *Carpenter v. United States* 585 (2018) quoting Katz, 389 U. S., at 351–352.

111.    The Courts have also ruled, "But the fact of "diminished privacy interests does not mean that the Fourth Amendment falls out of the picture entirely." *Carpenter v. United States* 585 (2018) quoting *Riley*, 573 U. S., at ___ (slip op., at 16)

112.    As it pertains to e-mails, the Courts have not waived expectations of privacy. Indeed, most e-mail communications are intended to be conveyed to third parties. "It follows that email requires strong protection under the Fourth Amendment; otherwise, the Fourth Amendment would prove an ineffective guardian of private communication, an essential purpose it has long been recognized to serve." *United States v. Warshak et al*. 631 F.3d 266 (6th Cir. 2010).

113.    The Plaintiff asserts that the Defendant violated the expectations of privacy protected by the Fourth Amendment by publishing a false light portrayal of his private thoughts and religious expressions as conveyed by him in e-mail form, as a pretext for seizing his property interest in employment. The Plaintiff further asserts society would find it exceptionally egregious for government to receive a person's private e-mail from a third party, launch an investigation into that person's private e-mail, that investigation concludes that there were no threats to anyone's personal safety within the e-mail's contents, yet that government publish anyway the knowingly libelous statement that the person's private e-mail contained a threat to someone's personal safety.

114.    *"It is undisputed that the Comprehensive Merit Protection Act creates a property interest for employees governed by it." Sanders v. DC,* 522 F. Supp. 2d 83 (D.D.C. 2007) quoting <u>Fonville v.</u>

*District of Columbia*, 448 F. Supp. 2d 21, 26 (D.D.C. 2006).

115.    As a Career Service employee governed under the CMPA, the Plaintiff enjoyed a property interest in his employment. *Sanders v. DC* 522 F. Supp. 2d 83 (D.D.C. 2007). At the time the Defendant received a personal and private e-mail written by the Plaintiff, he was on AWOL status 11-months as a previous attempt to separate the Plaintiff from his employment was exposed by the Plaintiff as a deliberate violation of DC municipal law and of due process. Therefore, the Plaintiff asserts, as the Defendant had no grounds to terminate him for any infraction cognizable as a personnel matter governed by the CMPA, the Defendant maliciously and libelously published the false statement that the Plaintiff's personal and private e-mail threatened the personal safety of a DC government employee, as a pretext to circumvent the due process provisions of the CMPA to unlawfully dispossess the Plaintiff of his property interest. Thus, the Defendant unreasonably seized the Plaintiff's property interest in violation of the protections afforded by the Fourth Amendment. *United States v. Jacobsen*, 466 U.S. 109, 113, (1984). "These interests — property interests — may take many forms." *Board of Regents v. Roth*, 408 U.S. 564, 576 (1972).

## COUNT III
### Fifth Amendment Due Process Clause 42 U.S.C. § 1983
### Violation of Substantive, Property, and Liberty Rights

116.    Plaintiff Bell adopts and incorporates by reference the factual allegations enumerated in the preceding paragraphs as if set forth fully herein.

*Substantive Due Process*

117.    The Plaintiff avers the Defendant deprived him of entitlements defined by the CMPA in violation of the substantive due process protections afforded by the Fifth Amendment.

118.    "It is undisputed that the Comprehensive Merit Protection Act creates a property interest for employees governed by it." *Sanders v. DC,* 522 F. Supp. 2d 83 (D.D.C. 2007) quoting *Fonville v.*

*District of Columbia*, 448 F. Supp. 2d 21, 26 (D.D.C. 2006).

119.    And the Supreme Court has noted that "property" is a broad and majestic term and may take many forms. The dimensions of these interests are defined by independent sources such as state laws which secure certain benefits and that support claims of entitlement to those benefits. *Gonzales v. City of Castle Rock*, 366 F.3d 1093, 1101 (10th Cir. 2004).

120.    The legislation establishing the District of Columbia's Merit Personnel System, is that independent source of law which defines substantive rights which employees who possess a property interest created by the CMPA are entitled to enjoy:

> *"Employees should have the following rights and responsibilities: The right to humane, dignified, and reasonable conditions of employment, which allow for personal growth and self-fulfillment, and for the unhindered discharge of job responsibilities…".*

D.C. Code §1-615.58(5).

121.    DC government's recognition of its heightened duty to protect employees' substantive rights is further declared at 6-B DCMR § 2000.1:

> *"The District of Columbia government is committed to providing a safe and secure workplace for its employees. To provide a safe and secure workplace, employees must be able to perform their duties in a safe, secure, productive, and effective manner."*

122.    It is additionally true "The Supreme Court has recognized a constitutional liberty interest in one's reputation." *Lea v. District of Columbia* et al, No. 1:2022cv01396 - Document 41 (D.D.C. 2023).

123.    The Defendant failed in its substantive due process duty to provide the Plaintiff, a DC government employee, with a work environment humane, dignified, and with reasonable conditions of employment. The Plaintiff reported a Woman being humiliated in the workplace as an act which made his work environment inhumane, undignified, and unreasonable. The Defendant did nothing. ¶¶ 11-12. In retaliation for reporting this act, the Plaintiff is stigmatized as a violent menace. Instead

of protecting the Plaintiff's liberty interest in his reputation, the Defendant hinders the Plaintiff in the discharge of his job responsibilities, by informing him as a condition of his continued employment, he must submit an affidavit that he is not intending on killing, murdering, maiming or otherwise bringing harm to DC government employees. And after this, Plaintiff is summoned to a meeting where he is asked upwards of three (3) times before seven (7) persons if he intends vile harm to staff. ¶¶14,15,23.  When the Plaintiff begs the Defendant to safeguard his reputation so that he can perform his duties in a productive and effective manner, the Defendant then charges the Plaintiff AWOL ¶35, then summarily removes him from employment, further impugning his reputation by libelously accusing him of threatening the personal safety of a DC government employee. ¶73.

124.    The Plaintiff in the instant case, an employee of DC government, was also a member of AFGE Local 2978, which has a collective bargaining agreement (CBA) with the Defendant.  The CBA provides in Article 14: Health and Safety, that: a) The employer agrees to take corrective action to have all reported hazardous or unsafe working conditions corrected; b) If an employee observes an unsafe practice, faulty equipment, or an environmental condition which represents health hazards, he/she shall report it to the appropriate supervisor; and c) Employees will not be requested to perform duties in areas which are unsafe or unhealthy as determined by a competent authority and shall be reassigned to other areas until safety problems have been resolved.

125.    The Plaintiff asserts Defendant violated the stipulations of the CBA by failing to respond to his report of unsafe working conditions, doing nothing to provide Plaintiff with a safe and secure work environment free from accusations and threats of violence, yet requesting the Plaintiff to report into this environment without any mitigating measures being implemented to safeguard the Plaintiff's reputation and to ensure that his physical person be safe and secure from violent harm.

126.    The Plaintiff's plea to the Defendant on July 9, 2021, served sufficient notice on the

Defendant of the threat and violation of his substantive due process rights and violation of his employee protections as enumerated in the CBA between the Defendant and AFGE. The Plaintiff alarmed the Defendant:

> "I now request DC Department of Human Resources to take over this complaint as discussions with my family and loved ones have convinced me that not only have I become the victim of harassment in the workplace and my professional character disparaged and maligned, but now my very life may be in jeopardy as well." ¶ 30.

127.   The Plaintiff's plea to the Defendant on December 21, 2021, served sufficient notice on the Defendant of the threat and violation of his substantive due process rights and violation of his employee protections as enumerated in the CBA between the Defendant and AFGE. The Plaintiff alarmed the Defendant:

> "This projection of me, this portrayal of me, as a person of violence presents an imminent safety risk for me and to my mental and emotional well-being. It causes a feeling of being feared by my co-workers, being watched by my Supervisors, and vulnerable to a physical assault in retaliation for the filing of my complaint under the guise of an act of self-defense, it haven been established I am a person of violence." ¶ 48.

128.   The Plaintiff's plea to the Defendant on June 7, 2022, served sufficient notice on the Defendant of the threat and violation of his substantive due process rights and violation of his employee protections as enumerated in the CBA between the Defendant and AFGE. The Plaintiff alarmed the Defendant:

> "Do HAHSTA top managers still think I wish to kill Mr. Eaton? I've not heard a word. Thus, I cannot perform my work effectively in such an environment, being stigmatized as a violent killer." ¶ 60.

129.   The Plaintiff asserts, in addition to the entitlements defined by the CMPA and rights given to employees under a CBA, as the Defendant demanded the Plaintiff report to duty in a space under Defendant's sole supervision as a condition of maintaining his property interest, the Defendant had a heightened duty to assure the Plaintiff's safety. This due process obligation arose because of

restrictions placed upon the Plaintiff of the means of which he could avail himself to protect his professional reputation as well as physical person from harm within space under the sole control and supervision of the Defendant.

130.    "When government has a heightened obligation, deliberate indifference will shock the conscience sufficiently to establish a substantive due process violation." *Harvey v. District of Columbia*, 798 F.3d 1042 (2015).

131.    The Plaintiff asserts the Defendant showing deliberate indifference to respond to, even acknowledge the Plaintiff's numerous pleas to the Defendant to act upon its heightened duty to protect the Plaintiff and safeguard his reputation, was a violation which would shock the conscience of every member of a jury. The Plaintiff informed the Defendant he felt his life was in jeopardy.

132.    The Supreme Court establishes: "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).

133.    The Plaintiff asserts the Defendant violated the Plaintiff's substantive due process protections in the instant case by subjecting him to a most egregious arbitrary action of government. After having his property interest diminished for demanding his substantive entitlements as defined by the CMPA, the Defendant totally stripped the Plaintiff of his property interest for writing an e-mail, while off duty, to the private and personal e-mail addresses of two DC government employees he had known for 17 years at the time. Within this e-mail, the Plaintiff detailed all the circumstances of his hostile work conditions. Yet, the Defendant terminated the Plaintiff for the contents of this e-mail, while claiming there were no mitigating circumstances. ¶ 80. The Director even has the contents of the Plaintiff's e-mail investigated by the Metropolitan Police Department. This investigation launched by the Director finds the Plaintiff threatened no one. ¶ 63. The Plaintiff even gives the Director evidence taken directly from Sherita Grant's court testimony, that she did not complain the Plaintiff's

e-mail contained threats to her physical safety. Moreover, the Plaintiff even informs the Director that he had no thoughts of harming anyone, that his only desire was for the Women under the Director's leadership to be shown respect. ¶ 67. And a month later, Director Nesbitt arbitrarily terminates the Plaintiff's employment by libelously accusing him of threatening the personal safety of Ms. Grant, a woman, by e-mail, despite all the evidence the Director had before her that the Plaintiff threaten no one.

134.    The CMPA, DCMR, and Chapter 16 of the DC Personnel Manual only explicate procedural remedies where an employee is subject to an agency's adverse action. These sources are silent on procedural remedies to be adhered to when an agency is charged with inaction. Nor does the CBA between Defendant and AFGE contain provisions where employees may compel the Defendant to act so that substantive rights may be enjoyed. The Plaintiff has not failed to exhaust administrative remedies as to obtaining his substantive rights. The only remedy for violation of substantive entitlements defined by District law and protected by the Fifth Amendment, is this Court.

## Due Process Procedural

135.    The Plaintiff makes a foundational claim that the Defendant violated the procedural due process protections of the Fifth Amendment in terminating his employment. *Rohr Industries, Inc. v. Washington Metropolitan Area Transit Authority*, 720 F.2d 1319 (D.C. Cir. 1983).

136.    Director Nesbitt, in an e-mail exchange with DC employee Grant, acknowledged she was exercising her authority as Director over a matter having no nexus to the Plaintiff's performance of his work responsibilities, when she informed Ms. Grant: *"I am; however, concerned that you are being contacted by [Plaintiff]via his personal e-mail, outside of his professional role in HAHSTA."* ¶ 58. Therefore, the Defendant cannot argue its actions against the Plaintiff were cognizable personnel issues. Thus, this procedural due process claim is properly before this Court. *Rohr*

*Industries, Inc. v. Washington Metropolitan Area Transit Authority*, 720 F.2d 1319 (D.C. Cir. 1983).

137.    The first step in establishing a § 1983 claim is to determine if the Plaintiff possessed a property interest. Courts have determined it undisputable that the CMPA creates a property interest for employees governed by it. *McManus v. District of Columbia*, 530 F.Supp.2d 46, 72 (D.D.C. 2007). The Plaintiff, as DC government employee covered under the Comprehensive Merit Personnel Act, had a property interest in his employment with DC government.

138.    As part of legislation establishing the procedures to be followed under the CMPA, DC Code § 1-616.51 provides: 1) disciplinary action may only be taken for cause; 2) definition for cause upon which action can be taken; 3) prior written notice of the grounds on which the action is proposed to be taken; and 4) a written opportunity to be heard before the action becomes effective.

139.    The Plaintiff was a member of AFGE and thus the CBA between AFGE and DC government governed. Article 27: Corrective/Adverse Actions, Section 1 of the CBA provides:

> *"Corrective/Adverse Actions shall be administered in accordance with the appropriate personnel regulations. Consistent with the District Personnel Manual, Chapter 16, disciplinary action shall be for cause and shall be progressive in nature."*

140.    Pursuant to CBA Article 27: Corrective/Adverse Action, Section 3:

> *"A charge of AWOL cannot be used as a form of disciplinary action; however, it may be used as a basis for disciplinary action only when employee is charged in a procedurally correct manner in accordance with personnel regulations.*

141.    DC personnel regulations stipulating the procedurally correct manner for charging employees with disciplinary action are promulgated at 6-B DCMR. A Corrective Action as specified at §1613.1(b), an Adverse Action as specified at §1614.3(b), and a Summary Action as specified at § 1616.5(b). All employer actions against employees require that an employee be given notice and right of response to an adverse employment action, before said action is taken.

142.    The Plaintiff in the instant case declares his due process protections were violated when on

July 28, 2021, he was charged AWOL without notice of his right of response before the adverse action was taken. ¶ 37. And the Plaintiff never received notice of his right of response to this adverse action.

143.    The Plaintiff in the instant case further declares his due process protections were violated when by executive action on July 15, 2022, he was summarily removed from employment without notice of his right of response before the adverse action was taken. ¶ 70.

144.    DC regulations at 6-B DCMR § 1602.2 mandate that for all corrective and adverse actions, managers shall be prepared to demonstrate that mitigating circumstances were considered, which include unusual job tensions, personal problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter.

145.    The Plaintiff declares his due process protections were violated when on July 28, 2021, he was charged AWOL by Defendant without any mitigating circumstances being considered. ¶ 37.

146.    The Plaintiff declares his due process protections were further violated when on December 14, 2021, he was sent a Proposed Separation letter which once again failed to consider any mitigating circumstances. ¶¶ 45-47.

147.    The Plaintiff asserts that his due process protections were again violated when on July 20, 2022, he received in the mail a Final Summary Removal Notice which claimed there were no mitigating circumstances involved with the adverse action. ¶80.

148.    DC regulations at 6-B DCMR § 1622.5 provide that, for proposed adverse actions or summary removal actions, within thirty (30) days after receiving the employee's response, or the expiration of his or her time to respond, the hearing officer shall submit a written report and recommendation to the deciding official and shall provide a copy to the employee.

149.    DC regulations at 6-B DCMR § 1623.6 provide the final decision of the deciding official shall

be completed within 45 days of receipt of the employee's response and DC regulations at 6-B DCMR § 1623.7 provide that the final decision on an adverse action or summary removal action shall be served upon the employee.

150.    The Plaintiff avers that the Defendant violated the Fifth Amendment as he answered a Proposed Separation on December 23, 2021, and never was served with a hearing officer's recommendation nor the final decision from the deciding official pursuant to 6-B DCMR § 1623.6 and 6-B DCMR § 1623.7. ¶¶ 48-52. The Plaintiff heard nothing from Defendant at all for over five months, until the proposing official admitted to Defendant's procedural error. ¶ 53. The Defendant's violation of the Plaintiff's employee due process protections was deliberate. The Defendant was aware its Proposed Separation could not stand upon the Plaintiff's Answer. Therefore, DC Health had the Plaintiff wait over 5-months, while involving another DC agency in the adverse action against the Plaintiff. However, DC Health did not provide the Plaintiff's Answer to that DC agency.

151.    "Constitutional due process requires a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment". *Thompson v. District of Columbia,* No. 14-7210 (D.C. Cir. 2016), quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985).

152.    The government is never relieved of its duty to provide some notice and some opportunity to be heard prior to final deprivation of a property interest. *Propert v. District of Columbia*, 948 F.2d 1332, 292 U.S. App. D.C. 219 (D.C. Cir. 1991)

153.    The Defendant put the Plaintiff on AWOL status on July 28, 2021, diminishing his property interest. When the Defendant subjected the Plaintiff to a final adverse action a year later, July 15, 2022, the Defendant still had not given the Plaintiff notice of a due process hearing to challenge his being placed on AWOL status. Thus, Defendant's action harmed the Plaintiff as he never received

notice of an adverse action and no remedy could the Defendant offer to meet the timeliness standard of D.C. Code § 1-616.51(5).

154.    The Plaintiff argues the way he was deprived of procedural due process was exceptional. *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90 (D.C. Cir. 1986).

155.    The Plaintiff files a complaint pursuant to DC government's Anti-Bullying Policy. The Defendant does nothing. ¶ 14. The Plaintiff is then retaliated against, accused of threatening violence in the workplace. He requests the Defendant to safeguard his reputation and to protect him from the acts of two obviously mentally disturbed employees. The Defendant does nothing. Instead, the Defendant puts the Plaintiff on AWOL status, and without providing him with notice of his due process right of response. ¶¶ 19-36. After being on AWOL four months, the Defendant sends the Plaintiff a Proposed Separation, without factoring any mitigating circumstances as required by the CMPA. ¶ 45. The Plaintiff Answers. The Defendant fails to respond to the Plaintiff, continuing to charge him AWOL, for another six months. The Plaintiff is directed to return to work but without any of his safety concerns remediated. The very next day, the Plaintiff is directed not to return to work without any explanation given. ¶¶ 53-54. Then, the Plaintiff is served a Peace Order petition, where he learns the Director of DC Health has promised the Plaintiff's adversary the "best way" to handle her complaint against the Plaintiff. The Plaintiff learns by listening to his adversary's testimony in court, the Defendant had his private and personal and lawful communication sent to the District of Columbia Metropolitan Police Department for investigation. According to this testimony, it was found the Plaintiff threatened no one in his private and personal communication. ¶¶ 57,61. The Plaintiff sends a communication to the Director of DC Health, informing her of the testimony in court and sharing with her all he had endured to suffer for making a report of bullying in the workplace according to DC Health's Anti-Bullying Policy. ¶¶ 62-68.  A month later, the Plaintiff unexpectedly receives in the mail a Final Summary Removal Notice informing him he had been removed from

employment for threatening the personal safety of a DC government employee by e-mail, although the Defendant was aware that its investigation determined the Plaintiff had not threatened the personal safety of anyone and furthermore, the Plaintiff's e-mail to Ms. Grant was not a part of his job duties. Moreover, the Plaintiff's Attorney specifically requests the Defendant to rescind the Final Summary Removal, so the Plaintiff be afforded his *"due process"* right of response. The Defendant never acknowledges the Plaintiff's request. ¶¶ 88-89. The Plaintiff would argue any claim of administrative remedies be waived in light of the circumstances above. The Plaintiff trusts the Court would even agree, it would have been futile for the Plaintiff to expect the dogged actions of no less than the Director of an agency against an employee, to be reversed. However, the Plaintiff has no claims which derive from an agency decision about his work performance or conduct. The Plaintiff's claims are all related to the Defendant's violations of substantive due process and deprivation of the Plaintiff's constitutional interest in his reputation. The Defendant has been deaf to the Plaintiff's claims, beyond failing to offer him any administrative remedy to address his foundational claims the Defendant violated due process. The Plaintiff has not failed to exhaust administrative remedies.

*Due Process Liberty-Reputation Plus*

156.    "Defamation accompanied by a discharge of employment is an actionable due process claim." *O'Donnell v. Barry*, No. 97-7129 (1998).

157.    Plaintiff asserts the Defendant deprived him of liberty interests by discharging him from employment, defaming him by alleging that he threatened the personal safety of a DC government employee by a personal and private e-mail he sent to the employee. ¶ 73.

158.    "True threats encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia v. Black*, 538 U.S. 343 (2003), quoting Watts v. United States, supra, at 708.

159.    Director Nesbitt had the Plaintiff's private e-mail investigated by the Metropolitan Police Department. The investigation found the contents of the Plaintiff's e-mail contained no personal threats to anyone. Nor has the Defendant produced one statement from the Plaintiff's email that could even be claimed as a serious expression to commit an act of unlawful violence to anyone. To the contrary, the Plaintiff's e-mail was decrying his being accused of threatening violence. ¶ 56. Thus, the Defendant violated liberties protected by the Fifth Amendment by discharging and defaming the Plaintiff by a malicious act of Director LaQuandra Nesbitt.

*Due Process Liberty Interest: Stigma Plus*

160.    Stigma Plus claims depend upon a continuous stigma or disability arising from the action. *Lea v. District of Columbia* No. 1:22-cv-01396 (2022).

161.    The Defendant deprived the Plaintiff of a liberty interest by terminating him for threatening the personal safety of a DC government employee. This libelous claim has been repeated a total of 13 times in the Final Summary Removal Notice executed against the Plaintiff.

162.    The Plaintiff should not have to prove that being terminated for threatening the personal safety of co-workers and employees is a stigma that deprives one of a liberty to pursue work in a particular field. The stigma carried with the Plaintiff's Final Summary Removal specifically deprives him of the liberty to work at DC government, with whom the Plaintiff had an economic interest for 18 years prior to his summary removal. Pursuant to 6-B DCMR § 402.1(a) all candidates for employment with the District must be screened for suitability. This screening includes the reason for separation from past employment.

163.    And pursuant to 6-B DCMR § 1623.11: "*A final agency decision separating an employee from government service shall be a permanent record maintained by the personnel authority in the official personnel file.*"

164.    The Final Summary Removal Notice from Director Nesbitt serves as evidence that Defendant was aware of the stigma resulting from the reason proffered for the Plaintiff's termination. The Notice even serves as evidence that the Defendant intended to stigmatize the Plaintiff to deprive him of his liberty. ¶ 75. The Plaintiff serves as an expert in the federal program Housing Opportunity for Persons With AIDS. There is not another jurisdiction within 50 miles of the Plaintiff's residence which administers this grant. The Director specifically chastises the Plaintiff:

> *"Additionally, as you supported a federal grant, if HUD were to become aware of your conduct, it could undermine the continuation of the grant and future grants the Agency may apply for."*

*Unconstitutional Policy or Custom*

165.    In order to hold a municipality liable for civil rights violations of its employees under the First Amendment, the municipality must have acted in accordance with a "government policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Sanders v. District of Columbia*, 522 F. Supp. 2d 83 (D.D.C. 2007).

166.    Plaintiff Bell was summarily removed from DC government by none other than DC Health Director, LaQuandra Nesbitt, ultimately and personally, when the Director received from DC government employee Sherita Grant, an e-mail written by the Plaintiff. Director Nesbitt, as an agency head in the Executive Services, appointed pursuant to § 1-523.01 of the D.C. Code, is responsible for assisting the Mayor in advancing program responsibilities of the District government pursuant to § 1–610.51. As the Director, only she had the authority granted by 6-B DCMR § 1616.3 to execute a Summary Removal.

## COUNT IV
### Violation of the District of Columbia Whistleblower Law D.C. Code § 1-615.51, *et seq.*

167.    Plaintiff Bell adopts and incorporates by reference the factual allegations enumerated in the preceding paragraphs as if set forth fully herein.

168.    The Plaintiff avers he was unlawfully terminated from employment by the Defendant for engaging in an act protected by the District of Columbia Whistleblower Act.

169.    "The District government's whistleblower protection laws protect any disclosure of information, not specifically prohibited by statute, without restriction to time, place, form, motive, context, forum, or prior disclosure made to any person by an employee." D.C. Code 1-615.52 et seq.

170.    Director Nesbitt wrote in her Final Summary Removal Notice:

> *"After carefully considering the summary removal and the recommendations of the administrative review officer, I conclude that the Summary Removal action is the appropriate resolution of this matter."*

171.    The recommendations of the administrative review officer, Assistant General Counsel Andreeze Williams, were very clear and specific. The Plaintiff's exposure to Ms. Grant and Ms. Green of District Government business factored into Ms. Willams recommendation the Plaintiff be terminated. Ms. Williams writes:

> *"Although he used a personal e-mail account to send his June 1, 2022 email to Ms. Grant's personal email account, his email referenced District Government business, in particular his objections to the manner in which certain HAHSTA matters are conducted."*

172.    The matters to which the Plaintiff objected to the manner in which HAHSTA addressed them was DC Health's failure to investigate the Plaintiff's reporting a Woman employee being bullied and humiliated before 15 other employees by a male employee, according to DC government's Anti-Bullying Policy. The Plaintiff also objected to Defendant failing to protect him from an outrageous, violently threatening retaliation plot for making his report.

173.    D.C. Code § 1–615.54 (b) states in a civil action or administrative proceeding, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by § 1-615.53 was a contributing factor in the alleged prohibited personnel action against an employee, the burden of proof shall be on the defendant to prove by clear and convincing evidence that the alleged action

would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by this section.

174.    In the instant case there is evidence the Plaintiff would not have been terminated for legitimate independent reasons if he had not engaged in a protected activity. This evidence comes by way of the Final Summary Removal Notice issued by the Director of DC Health.  The Final Summary Removal Notice admits that no disciplinary history nor performance complaints factored in the decision to terminate the Plaintiff. ¶¶ 82-83. The Defendant terminated the Plaintiff solely upon the evidence of an e-mail wherein the Plaintiff mentioned his intention of making public, DC Health's failure to address Women being bullied and humiliated in DC government's workspace and for its failure to protect him from retaliation for reporting that a Woman had been bullied and humiliated in the workspace. Moreover, the Plaintiff's e-mail declared his intent to publicize the Defendant's willful violations of DC labor law.

## COUNT V
### District of Columbia Human Rights Act, D.C. Code Ann. § 2-1401, *et seq* Sex

175.    Plaintiff Bell adopts and incorporates by reference the factual allegations enumerated in the preceding paragraphs as if set forth fully herein.

176.    The Plaintiff avers the Defendant subjected him to discrimination because of his sex, in violation of the District of Columbia Human Rights Act. This unlawful discrimination took the form of the Defendant not responding to the Plaintiff's reporting an act of bullying so that his work environment be humane, dignified, and the conditions of his employment reasonable. This unlawful discrimination also took the form of the Defendant woefully failing to protect the Plaintiff from being retaliated against for reporting this act of bullying, by two employees who conspired to stereotype and stigmatize the Plaintiff as violent. This unlawful discrimination also took the form of the

Defendant charging the Plaintiff AWOL without any due process, then terminating his employment, maliciously accusing the Plaintiff of threatening the personal safety by e-mail, of one of the employees from whose retaliation the Plaintiff was seeking the Defendant's protection.

177.    D.C. Code does not force a victim of an act made unlawful by the Human Rights Act to find a comparator without who's discovery, acts of discrimination and disparate treatment against a human being becomes lawful. Under the Human Rights Act it shall be an unlawful discriminatory practice to do any act for any reason that would not have been asserted but for, wholly or partially, a discriminatory reason based on the actual or perceived sex of any individual.

178.    The Plaintiff alerted his supervisor and Deputy Director of Operations ¶ 23, DC Health in response to its Proposed Separation ¶ 51; and Director of DC Health LaQuandra Nesbitt ¶66, that he believed for no reason other than his gender, he was being discriminated against. Not one of his pleas did DC government respond to.

179.    In contrast to the discriminatory manner in which the Plaintiff was treated, when DC employee Grant, a woman, alleged the Plaintiff was making her work environment hostile, while she worked from home, the Plaintiff was summoned to mediation to address Ms. Grant's allegations. When Ms. Grant claimed she was "fearful" of the Plaintiff, the Director of DC Health, LaQuandra Nesbitt, immediately reacted, promising Ms. Grant that she would assist her against the Plaintiff. ¶ 57. The Director had the Plaintiff's private e-mail directed to Ms. Grant investigated by the District of Columbia Metropolitan Police Department and although the investigation concluded the Plaintiff did not threaten Ms. Grant, the Director outlandishly manufactured that the Plaintiff threatened Ms. Grant's personal safety anyway, as justification for terminating the Plaintiff.

180.    DCHRA requires the Defendant to answer, at least partially if not for his gender, why was nothing done to address the Plaintiff's reporting a Women being bullied and humiliated in the

workplace, yet he be allowed to suffer retaliation, then suffer the loss of his employment by an arbitrary and malicious act executed by the Department Director LaQuandra Nesbitt.

## COUNT VI
### District of Columbia Human Rights Act, D.C. Code Ann. § 2-1401, *et seq.* Sexual Orientation

181.    Plaintiff Bell adopts and incorporates by reference the factual allegations enumerated in the preceding paragraphs as if set forth fully herein.

182.    The Plaintiff avers the Defendant subjected him to discrimination because of his sexual orientation, in violation of the District of Columbia Human Rights Act. This unlawful discrimination took the form of the Defendant woefully failing to protect the Plaintiff's physical person and professional reputation from harm coming from the retaliation of two employees who conspired to stereotype and stigmatize the Plaintiff as violent Black Man. This unlawful discrimination also took the form of the Defendant charging the Plaintiff AWOL without any due process, then terminating his employment, maliciously accusing the Plaintiff of threatening the personal safety by e-mail, of one of the employees from whose retaliation the Plaintiff was seeking the Defendant's protection.

183.    D.C. Code does not force a victim of an act made unlawful by the Human Rights Act to find a comparator without who's discovery, acts of discrimination and disparate treatment against a human being becomes lawful. Under the Human Rights Act it shall be an unlawful discriminatory practice to do any act for any reason that would not have been asserted but for, wholly or partially, a discriminatory reason based on the actual or perceived sexual orientation of any individual.

184.    The Plaintiff argues it is obvious, if not for his sexual orientation, the Defendant would have addressed his pleas not to be stigmatized and suffer the stereotype of the angry Black male menace. The Plaintiff worked for an agency whose mission is to combat stigma heaped upon historically marginalized groups, particular focus is upon persons who identify as lesbian, gay, bisexual,

transgender, queer, and of other sexual identities. From the agency's website:

> "DC Health has developed programs on the health of people who use drugs, sexual pleasure, and social and emotional well-being, and initiatives that address matters such as employment, fellowship, and housing. It has also aimed to not assign risk to people based on their identities, instead defining risk in terms of behavior (for example, not wearing condoms, not knowing the status of a partner) to lessen the stigma people might feel. All recent programs and efforts have aimed for diversity, equity, and inclusion of a number of populations often left at the margins, as well as to decrease the stigma placed on some of these populations. https://www.dcendshiv.org/our-plan/the-big-picture".

185.    The Plaintiff argues it is obvious, that if not for his sexual orientation, the Defendant would have addressed his pleas not to be stigmatized and suffer the stereotype of the angry Black male menace.  The Plaintiff's immediate supervisor was HAHSTA Bureau Chief Anthony Fox. As the Plaintiff's supervisor, Mr. Fox did nothing to address the Plaintiff's pleas not to be stereotyped and stigmatized as an angry and violent Black male menace.  Mr. Fox never once asked the Plaintiff about his anxiety with having to work in an environment where not one but two people were portraying the Plaintiff as being a serious risk to the safety of the workplace. In contrast, Mr. Fox's ardent concern for the anxiety suffered of gay Black males for being gay drives his research. Mr. Fox announced on his social media page:

> We all know that many of our young African American brothers experience some forms of depression and anxiety, even thoughts of suicide.  However, many of them will never seek any form of therapy treatment.  I want to understand why this is happening.  Is it based on beliefs and attitudes or other contributing factors?  As a counseling professional and an African American Gay Man, I want to help and make a difference. https://www.surveymonkey.com/r/DrFox2023 - survey link."

186.    The Plaintiff alerted his supervisor and Deputy Director of Operations ¶ 23, DC Health in response to its Proposed Separation ¶ 50; and Director of DC Health LaQuandra Nesbitt ¶66, that he believed for no reason other than his sexual orientation, he was being discriminated against. Not one of his pleas did DC government respond to.

187.    The burden is upon the Defendant to explain, at least not partially because of his sexual orientation, why over the course of 18 months, in an environment dedicated to eliminating stigma

suffered by LGBTQIA+ persons, was the Plaintiff's pleas for protection from being stigmatized as an angry and violent Black Man not once acknowledged.

## COUNT VII
### District of Columbia Human Rights Act, D.C. Code Ann. § 2-1401, *et seq* Religion

188.    Plaintiff Bell adopts and incorporates by reference the factual allegations enumerated in the preceding paragraphs as if set forth fully herein.

189.    The Plaintiff avers the Defendant subjected him to discrimination because of his perceived religion. This unlawful discrimination first took the form of the Defendant not acting to effectively address a matter which the Plaintiff informed the Defendant he thought to be of divine importance, that matter being eliminating Women being bullied, disrespected, and humiliated in the workplace. This form of unlawful discrimination was also manifested in the Defendant receiving a personal, private, and lawful communication written by the Plaintiff, and sending that communication to the District of Columbia Metropolitan Police Department seeking criminal charges against the Plaintiff. The investigation concludes the Plaintiff threatened no one. Yet, the Defendant terminates the Plaintiff for threatening the personal safety of DC government employee Sherita Grant by e-mail.

190.    D.C. Code does not force a victim of an act made unlawful by the Human Rights Act to find a comparator without who's discovery, acts of discrimination and disparate treatment against a human being becomes lawful. Under the Human Rights Act it shall be an unlawful discriminatory practice to do any act for any reason that would not have been asserted but for, wholly or partially, a discriminatory reason based on the actual or perceived religion of any individual.

191.    The Defendant, in receiving from Sherita Grant, a personal and private e-mail written by the Plaintiff, was able to perceive Islaam was the Plaintiff's religion. The Plaintiff referenced "Allah" in his e-mail. While Allah is a Semitic name for the deity used by Arabic speaking Jews and Christians,

the name Allah is most associated with Islam. The Plaintiff also made a religious reference in his private e-mail of the Day of Reckoning, which Plaintiff argues factored into the Defendant's perception of the Plaintiff's religious views. ¶ 57. And while there were absolutely no threats of violence at all to be found in the Plaintiff's e-mail, a total of 13 times, in the Final Summary Removal Notice sent to the Plaintiff, and right now sitting in his personnel file, appears the statement that the Plaintiff threatened the personal safety of a DC government employee. The Defendant's comfortability in falsely portraying the Plaintiff as a threat to cause an act of terror in the workplace is clearly Islamophobic in essence. Indeed, that the Defendant determined to forward the Plaintiff's e-mail to the District of Columbia's Metropolitan Police Department's First District, hoping to criminalize the Plaintiff, reeks of Islamophobia. For a director of an organization, for a human being, to be so callous as to accuse another human being of such a heinous act as threatening violence, which was known to be untrue, and then for one to use their authority to strip another of their employment, there must be personal animus involved, the kind motivated by religious hatred in the Plaintiff's view.

192.    The burden of proof is upon the Defendant to explain, if not partially because of the Plaintiff's perceived religion, why Director Nesbitt and her legal counsel were so comfortable in falsely accusing the Plaintiff of threatening violence when an investigation proved the accusation untrue.

## COUNT VIII
### District of Columbia Comprehensive Merit Personnel Act, D.C. Code § 1-603.01, *et*

193.    Plaintiff Bell adopts and incorporates by reference the factual allegations enumerated in the preceding paragraphs as if set forth fully herein.

194.    The Plaintiff avers the Defendant violated the District of Columbia Merit Personnel Act (CMPA) by depriving the Plaintiff of substantive due process and terminating the Plaintiff's

employment in violation of the due process procedural provisions of the CMPA.

195.    The legislation establishing the District of Columbia's Merit Personnel System defines

substantive rights which employees are entitled to enjoy:

> *"Employees should have the following rights and responsibilities: The right to humane, dignified, and reasonable conditions of employment, which allow for personal growth and self-fulfillment, and for the unhindered discharge of job responsibilities…".*

D.C. Code §1-615.58(5).

196.    So that DC government employees have humane, dignified, and reasonable conditions of

employment, the DCHR has published Issuance-2019-8 which reads:

> *"DCHR works to foster a healthy and collaborative work environment where all District of Columbia Government employees can thrive. The work environment should be one where employees feel safe, supported, and comfortable reaching out to their managers. Everyone has a role to play when it comes to keeping bullying out of the workplace. All District employees are expected to show respect for one another and immediately report instances of workplace bullying when they see it happening."*

197.    The Plaintiff reported an act of bullying as encouraged by DCHR Issuance-2019-8, but the

Defendant violated his substantive rights by failing to act. ¶¶ 13-14.

198.    The District of Columbia's Merit Personnel System, DC Code § 1-616.51 provides: 1)

disciplinary action may only be taken for cause; 2) definition for cause upon which action can be

taken; 3) prior written notice of the grounds on which the action is proposed to be taken; and 4) a

written opportunity to be heard before the action becomes effective.

199.    The Plaintiff asserts the Defendant violated the CMPA by charging the Plaintiff AWOL for

11 months without affording him a written opportunity to be heard before the action became effective

and then terminating him from his position at DC Health without prior notice or a written opportunity

to be heard before the final adverse action became effective. ¶¶ 37, 70.

200.    DC regulations at 6-B DCMR § 1602.2 mandate for all corrective and adverse actions,

managers shall be prepared to demonstrate that mitigating circumstances were considered, which

include unusual job tensions, personal problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter.

201.    The Defendant violated the CMPA by charging the Plaintiff AWOL, subjecting the Plaintiff to a proposed separation, and summarily removing the Plaintiff from employment without any mitigating circumstances being considered once. ¶¶ 37, 45, 79.

202.    DC regulations at 6-B DCMR § 1622.5 provide that, for proposed adverse actions or summary removal action, within thirty (30) days after receiving the employee's response, or the expiration of his or her time to respond, the hearing officer shall submit a written report and recommendation to the deciding official, and shall provide a copy to the employee.

203.    DC regulations at 6-B DCMR § 1623.6 provide the final decision of the deciding official shall be completed within 45 days of receipt of the employee's response and regulations at 6-B DCMR § 1623.7 provide that the final decision on an adverse action or summary removal action shall be served upon the employee.

204.    The Plaintiff's CMPA claim is that he was denied constitutional due process rights afforded by the CMPA as codified in DC Municipal Regulations and in Chapter 16 of the DC Employee Manual, because he never received the hearing officer's recommendation nor the deciding official's determination after he answered Defendant's proposed separation. ¶ 52.

## COUNT IX
### Constructive Discharge

205.    Plaintiff Bell adopts and incorporates by reference the factual allegations enumerated in the preceding paragraphs as if set forth fully herein.

206.    The Plaintiff avers the Defendant's failure to protect his professional reputation and physical person from rumors and threats of violence, then subjecting him to retaliatory discrimination, led to

his constructive discharge from employment.

207.    Constructive discharge is determined by an objective standard: "[d]id working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Mentzer v. Lanier*, 677 F. Supp. 2d 242, 253 (D.D.C. 2010).

208.    In the D.C. Circuit, "[a]n actionable constructive discharge claim requires a showing that (1) intentional discrimination existed, (2) the employer deliberately made working conditions intolerable, and (3) aggravating factors justified the plaintiff's conclusion that [s]he had no option but to end her employment." *Brown v. District of Columbia.*, 09-1121, (citing *Carter v. George Wash. Univ.,* 180 F. Supp. 2d 97, 110 (D.D.C. 2001) (citing *Clark v. Marsh,* 665 F.2d 1168, 1173-74 (D.C. Cir. 1981)).

209.    The Plaintiff asserts Defendant intentionally discriminated against him by not responding to his myriad pleas to address rumors of violence in the workplace concerning the Plaintiff. The Plaintiff asserts the Defendant intentionally discriminated against him by not responding to his pleas his reputation be safeguarded from false and malicious rumors he was intending to commit an act of violence in the workplace or that he was so angry as to commit an act of violence in the workplace.

210.    The Plaintiff argues the Defendant's deliberate indifference to his concerns about rumors and threats of violence in the workplace made the Plaintiff's work conditions intolerable.

211.    The Plaintiff argues no reasonable person would report to work in an environment where two employees were claiming to fear an act of violence from that person, yet management do nothing to protect the professional reputation of the accused. The Plaintiff further argues no reasonable person would report into a work environment until something was done to guarantee their physical safety from not one, but two employees conspiring against them by making accusations of violence.

## COUNT X

### Hostile Work Environment

212.    Plaintiff Bell adopts and incorporates by reference the factual allegations enumerated in the preceding paragraphs as if set forth fully herein.

213.    The Plaintiff avers the Defendant's failure to protect his professional reputation and physical person from rumors and threats of violence, then subjecting him to retaliatory discrimination, created a hostile work environment.

214.    To prove a hostile work environment claim, plaintiffs must "show that they were subjected to 'intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of ...employment and create an abusive working environment." *Brown vs. District of Columbia*., 09-1121 Mentzer, 677 F. Supp. 2d at 253 (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).

215.    As the Factual Allegations of this Amended Complaint detail, the Plaintiff was subject to severe and pervasive insult to his professional reputation and character. He reports an employee for bullying, that employee launches a retaliation scheme, and it is the Plaintiff who is directed to submit an affidavit affirming he was not intending on killing, maiming, murdering, or otherwise injuring any DC Health employee. ¶ 16. The Plaintiff learns that senior management has informed his supervisor: "*They told me you threatened to kill the man.*" ¶18.  An employee learning that Senior Management entertained the notion that the employee actually threatened to kill a co-worker is severely insulting. And as in the instant case, when the employee begs Management to address this insult to one's reputation, but instead, the employee is confronted with additional allegations, even asked upwards of three (3) times before seven persons to denounce intending violence, well the Plaintiff argues this created for him an abusive work environment. And the Defendant is liable for failing to do anything to improve the Plaintiff's work environment, the Plaintiff asserts.

## COUNT XI
### Intentional Infliction of Emotional Distress

216.    Plaintiff Bell adopts and incorporates by reference the factual allegations enumerated in the preceding paragraphs as if set forth fully herein.

217.    The Plaintiff avers the Defendant engaged in intentional extreme and outrageous conduct against him, in a deliberate effort to cause the Plaintiff severe emotional suffering, so that the Plaintiff would quit his employment.

218.    To prevail on a claim for deliberate infliction of emotional anguish, three elements must be shown to the court: that the conduct was (1) extreme and outrageous, (2) intentional or reckless, and (3) causes severe emotional suffering. *See District of Columbia v. Tulin, 994 A.2d 788 (D.C. 2010).*

219.    Extreme and outrageous conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Larijani v. Georgetown Univ., 791 A.2d 41, 44 (D.C. 2002).*

220.    The Plaintiff asserts in the instant case, evidence that the Defendant's actions were outrageous, is inherent in what ironically led to the deterioration of the Plaintiff's work conditions. As the Factual Allegations of this Amended Complaint details, the Plaintiff reported an incident which he concluded to be against DC government's Anti-Bullying policy. ¶ 13. That the Defendant promulgated an Issuance to address workplace bullying suffices as evidence that bullying is an act which even the Defendant recognizes to be beyond all possible bounds of decency to a civilized society. Therefore, for the Defendant to fail to address the Plaintiff's reporting of an act which even the Defendant recognizes to be beyond all possible bounds of decency, must in and of itself be beyond all possible bounds of decency.

221.    The Plaintiff asserts the Defendant not addressing his myriad complaints about his safety in

the workplace was outrageous. The Plaintiff informs DCHR he feels his life is threatened by a retaliatory act of violence from two maniacal employees who are claiming to fear acts of violence from him and DCHR does not even acknowledge his plea. ¶¶ 30-33. Outrageous. The Plaintiff requested extended leave, *unpaid*, until Defendant does something to make him safe from rumors and threats of violence. The Defendant responds by placing the Plaintiff on AWOL without giving him due process. ¶¶ 37. Outrageous. The Plaintiff, on AWOL for over four months, is waiting for DCHR to rescue him. Instead of being rescued from rumors and threats of violence, the Plaintiff is sent a Proposed Separation Letter, with his Supervisor Anthony Fox saying: "*As a solid performer of his work, it is difficult to understand his level of disregard for following instructions*".  ¶ 46. Outrageous.

222.    The Plaintiff asserts the second element of an Intentional Infliction of Emotional Distress claim, that the conduct must be intentional, is met in the acts of one Anthony Fox. Mr. Fox was the Plaintiff's supervisor. The Plaintiff notified the Defendant of the findings of his personal physician. "*It is my medical opinion that Baron Bell has been experiencing significant stress from a hostile work environment that is stemming from a poor feeling response to HR complaints."* ¶ 39. Then, while on AWOL status, waiting for resolution to his workplace saga, the Defendant sends the Plaintiff a Proposed Separation Letter. His Supervisor Anthony Fox says of the Plaintiff: "*As a solid performer of his work, it is difficult to understand his level of disregard for following instructions*". ¶ 46. As the Plaintiff's supervisor, Mr. Fox understood the Plaintiff prides himself in performing his work tasks on a level higher than satisfactory. Mr. Fox's statement is intentionally crafted to convey to the Plaintiff, not only is your demand for Women to be treated with respect in the workplace not considered worthy, but because of your efforts, we now perceive you to be on a lower level.

223.    Intentionality is certainly established by the acts of DC Health Director, LaQuandra Nesbitt. The Plaintiff wrote to Director Nesbitt a very respectful e-mail ¶ 62:

*"Near a year now, I have been begging and pleading for DC Health to take action to make me safe from the lies, slander, and character assassination from Mr. Eaton and Ms. Grant…DC Health has left me unprotected from the shenanigans of Sherita Grant and Ivan Eaton. My ardent desire was to be able to work in an environment free from Women being bullied, humiliated, and ridiculed. I wanted my work environment free from Women's Voices being deliberately misinterpreted in an effort to portray them as being nonsensical when actually making PERFECT SENSE! I was demanding Women at DC Health be shown RESPECT!"*

224.    Director Nesbitt's response to the Plaintiff's communication to her is unarguably intentional. The Director terminates the Plaintiff, libelously accusing him of threatening Ms. Grant's personal safety. Establishing Director Nesbitt's action as malicious, outrageous, and intentional, is the fact that she was aware from an investigation she requested to be conducted by the District of Columbia Metropolitan Police Department, that there were no threats in the Plaintiff's e-mail to the personal safety of DC government employee Ms. Grant. ¶ 61. To libelously accuse the Plaintiff by insinuating he was intending to bring violent harm to a Woman, when the Director heard directly from the Plaintiff that his goal was that Women working in DC government under her leadership be shown respect, was an act of intentional cruelty to cause injury. And that Director Nesbitt would falsely accuse the Plaintiff of threatening violence after reading in the Plaintiff's private e-mail his shock and emotional anguish with being portrayed and stereotyped as violently threatening, further evidences the intentionality behind Director Nesbitt's unlawful actions ¶ 56.

225.    Resulting from the Defendant's actions, the Plaintiff suffered loss of appetite, insomnia, anxiety, headaches, gastrointestinal disruption, and loss of concentration. The Plaintiff still suffers mental anguish from this ordeal, in particular, the Defendant has yet to acknowledge the outrageousness of what he has endured to suffer.

## COUNT XII
### Libelous Defamation

226.    Plaintiff Bell adopts and incorporates by reference the factual allegations enumerated in the

preceding paragraphs as if set forth fully herein.

227.    The Plaintiff avers the Defendant libelously defamed him.

228.    District of Columbia Courts have held a Plaintiff must prove four elements on a defamation claim: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm. *Jankovic v. International Crisis Group*, 429 F.Supp.2d 165, 173-4 (D.D.C. 2006).

229.    The Plaintiff in the instant case did not threaten the personal safety of anyone, but the Defendant claimed that he did.

230.    In the instant case, the Defendant published by way of a Final Summary Removal Notice, a Hearing Officer Recommendation, and a Summary Removal Letter to DC government, the false statement that the Plaintiff threatened someone's personal safety by e-mail.

231.    Director Nesbitt was responsible for Defendant's negligence in publishing the statement that the Plaintiff threatened an employee's personal safety by e-mail, as she launched an investigation into that e-mail and knew the results of the investigation found the Plaintiff threatened no one. ¶ 61.

232.    In the instant case, the Defendant in publishing a knowingly libelous statement to justify taking official adverse action resulting in Plaintiff's termination in employment rose to a level of constitutional malice. Therefore, harm is proven and assumed. *Jankovic v. International Crisis Group*, 429 F.Supp.2d 165, 173-4 (D.D.C. 2006).

<u>COUNT XIII</u>
**Invasion of Privacy False Light**

233.    Plaintiff Bell adopts and incorporates by reference the factual allegations enumerated in the

preceding paragraphs as if set forth fully herein.

234.    The Plaintiff avers the Defendant published a statement which portrayed his private speech, by e-mail, in a false light.

235.    "[U]nder District of Columbia law, a false light claim requires a showing of: (1) publicity; (2) about a false statement, representation or imputation; (3) understood to be of and concerning the plaintiff; and (4) which places the plaintiff in a false light that would be offensive to a reasonable person." *Ramos v. ADR Vantage, Inc.* 21-cv-00592 (APM) (D.D.C. Mar. 21, 2022).

236.    The Defendant, by publishing a false statement about the Plaintiff in the personnel records of DC government, gave publicity to a false statement about the Plaintiff.

237.    The Defendant portrayed the Plaintiff in a false light by publicizing a private and personal e-mail the Plaintiff wrote to a third party, he threatened that party's personal safety.

238.    The false statements from the Defendant about the Plaintiff were presented as fact and attributed to the Plaintiff by name in a Final Summary Removal Notice and Summary Removal Notice, and Hearing Officer's Recommendation. ¶¶ 73. 77, 79.

239.    The Plaintiff asserts any reasonable person would find highly offensive an accusation of threatening an individual's personal safety in the workplace. That the Defendant fabricated the false statement to justify ending the Plaintiff's employment is proof that the Defendant's false light portrayal was highly offensive.

## COUNT XIV
### Negligence

240.    Plaintiff Bell adopts and incorporates by reference the factual allegations enumerated in the preceding paragraphs as if set forth fully herein.

241.    The Plaintiff avers the Defendant was negligent in its duty towards the Plaintiff to provide

for him a safe and secure workspace where he could perform his assigned tasks unhindered.

242.    To prove a negligence claim, a plaintiff must establish "(1) that the defendant owed a duty to the plaintiff, (2) breach of that duty, and (3) injury to the plaintiff that was proximately caused by the breach." *Night & Day Mgmt., LLC v. Butler*, 101 A.3d 1033, 1038 (D.C. 2014).

243.    Defendant's duty owed employees is defined at 6-B DCMR § 2000.1. The Plaintiff was an employee of the District of Columbia.

244.    The Defendant breached its affirmative duty to the Plaintiff by failing to address his reporting an act of gender bullying pursuant to Defendant's Anti-Bullying Policy so his work environment would be safe from his having to witness Women being bullying. The Defendant also breached its affirmative duty to the Plaintiff by not responding to his safety demands that the Defendant take affirmative action to protect him from rumors and threats of violence in the workplace. ¶¶ 28, 34, 36, 38, 39, 46.

245.    The Plaintiff's injuries were suffered as the direct result of the Defendant's negligence to respond to his alarm that he could not report to work because he could not be productive if his name was not officially cleared of rumors of violence, and that he would not report to work until the Defendant took action to protect him from two government employees whose mental instabilities posed a great risk to the Plaintiff's safety. In fact, one of these employees admitted her mental instability towards the Plaintiff to the Director of DC Health. ¶ 59.

## COUNT XV
### Wrongful Termination

246.    Plaintiff Bell adopts and incorporates by reference the factual allegations enumerated in the preceding paragraphs as if set forth fully herein.

247.    The Plaintiff avers the Defendant subjected him to an illegal wrongful termination.

248.    To state a claim of wrongful termination under D.C. common law, a plaintiff must clearly articulate the applicable public policy and show a causal connection between the protected activity in which that plaintiff engaged and his or her termination. *Clayton v. District of Columbia et al*, No. 1:2011cv01889 - Document 34 (D.D.C. 2013)

249.    The Defendant in publishing the reasons for the Plaintiff's Final Summary Removal Notice acknowledged that within three (3) years of the Plaintiff's termination, he had not been subject to adverse or corrective action. Nor were there any complaints made against the Plaintiff in the performance of his job tasks. ¶¶81,82. The sole proffer of the Defendant for terminating the Plaintiff was that he sent an e-mail threatening the personal safety of a DC government employee Sherita Grant. However, the facts established in this case are that the Plaintiff's e-mail to Ms. Grant was investigated at the behest of the Director of the Defendant and this investigation found the Plaintiff had not threatened the personal safety of anyone. Therefore, the facts of the instant case expose the sole proffer given by the Defendant for the Plaintiff's termination as knowingly false. It must be then, the Plaintiff argues, the true reason for his termination was his informing DC employee Grant in his e-mail, that he planned to sue the Defendant for not investigating his report of an act of gender bullying in the workplace, pursuant to DC government's Anti-Bullying Policy, when the Plaintiff saw his co-worker, a Woman, being humiliated by male DC government employee Ivan Eaton.

250.    The Plaintiff argues that in wrongfully terminating his employment, the Defendant's violations of the protections afforded by the First Amendment, Fourth Amendment, and Fifth Amendment were not mere omissions. The Defendant acted with willful and intentional disregard to the First, Fourth, and Fifth Amendments of the US Constitution in a deliberate effort to bring harm to the Plaintiff. To the actions of former DC Health Director, LaQuandra Nesbitt; DC Health General Counsel, Phillip Husband; former DC Health Chief Operating Officer, Keith Fletcher; and Human

Resources Officer, John Parham; the Plaintiff respectfully requests this Court take judicial notice. All were aware the Plaintiff did not threaten anyone's personal safety and calculated to deprive the Plaintiff of due process. Now, the proof is in the Plaintiff's possession.

251.    Finally, the Plaintiff humbly requests this Court and its Honorable Judge to consider the Defendant's presentation made in its Motion to Dismiss, regarding there being no record of receipt of the Plaintiff's successful submission of the Section 12-309 Notice. If the Defendant's presentation to this Court and Honorable Judge were made in truth, according to the Federal Rules of Civil Procedure, then Exhibit 2 to this Amended Complaint could not have come into the Plaintiff's possession.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Baron Jamal Bell respectfully requests that she be awarded the following relief from Defendant:

A.    Equitable relief requiring the Defendant to reinstate Plaintiff Bell to his former position in a Career Appointment (Permanent) position at HAHSTA;

B.    The investigation and corrective action be taken regarding the Plaintiff's gender bullying and harassment complaint filed within DC Health;

C.    That HAHSTA employees Sherita Grant and Ivan Eaton be subject to the most severed disciplinary action available pursuant to DC Municipal Regulations;

D.    Removal of all remaining DC Health and HAHSTA officials who were involved in this gross and willful violation of the statutes and regulatory codes of the District of Columbia against the Plaintiff;

E.    Economic damages for lost compensation (including for retaliatory, unpaid suspensions), benefits, and damages to Plaintiff Bell's career;

F.    Compensatory and Punitive damages, in an amount to be determined at trial but no less than thirty million dollars ($30,000,000) for, but not limited to pain and suffering, emotional distress and reputational damage, and for intentional violations of the protections afforded by the First, Fourth, and Fifth Amendments of the United States Constitution, the District's Whistleblower Act, the District of Columbia Human Rights Act, and several torts;

G.    Reasonable costs and experts' and attorneys' fees;

H.    Pre and post judgment interest as provided by law;

I.    A Court Order declaring Defendant's actions to be a violation of the First, Fourth, and Fifth Amendments of the United States Constitution, 42 U.S.C. § 1983, the District of Columbia Whistleblower protection law § 1-615.51 *et seq*, the District of Columbia Human Rights Act, D.C. Code § 2-1401 *et seq*.; and all other Counts enumerated in this lawsuit; and

J.    A Court Order requiring Defendant to remove all libelous references in Plaintiff's personnel file, including but not limited to the Summary Removal Notice, Hearing Officer's Recommendation, and Final Summary Removal Notice.

Date: July 5, 2024                                              Respectfully submitted,

                                                                          Baron Jamaal Bell

### JURY TRIAL DEMAND

Plaintiff demands a jury trial on all claims against Defendant.

# IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA
## CIVIL DIVISION

BARON JAMAL BELL                          )
                                          )
    *Plaintiff,*                       )
                                          )
      v.                          )   23-cv-02036 (RC)
DISTRICT OF COLUMBIA                      )
                                          )
    *Defendants,*                     )

## CERTIFICATION

## PLAINTIFF'S AMENDED COMPLAINT

The Plaintiff, Baron Jamal Bell, pro se, hereby certifies Plaintiff's Amended Complaint, 23-cv-02036 (RC).

Respectfully submitted,

Baron Jamal Bell

July 5, 2024